## 38910. WILEY v. THE STATE.

SMITH, Justice.

In December 1981 appellant Anthony "Amp" Wiley was convicted in DeKalb County of murder, two counts of armed robbery, two counts of kidnapping, two counts of aggravated assault, aggravated battery, aggravated sodomy, and possession of a firearm during the commission of a crime. He was sentenced to five consecutive terms of life imprisonment plus a total of forty-five years for these offenses. He appeals an order overruling his motion for a new trial, and from the judgments of conviction and the sentences entered thereon. We affirm on all counts.

Rodney Favors, Lapas Favors (brothers), and appellant (a cousin of the Favors brothers) were together in the Clarkston apartment of Lapas and Rodney's mother on the morning of Monday, September 21, 1981. They were broke. The trio discussed various methods of making some quick money, principally by robbery. They formed a vague plan to obtain a few dollars by whatever means seemed opportune. At about 11:30 a.m. they left the apartment in Rodney Favors' car, which had a characteristic diamond-shaped radio antenna formed from a coat hanger. At a convenience store they bought beer and then drove along Church Street in the direction of Decatur. They entered Glen Lake Park to drink their beer and smoke marijuana and stopped in a parking lot facing picnic tables where two women were eating lunch together. There were three cars in the parking area besides Favors', and two were occupied. Appellant and the Favors brothers mutually agreed to rob someone in the park, preferably the two women. Rodney Favors decided to back his car into place in order to conceal the license tag and in doing so moved in beside one of the occupied cars. The driver of the car parked beside appellant and the Favors brothers later testified that he discussed football briefly with them and then left the park. Meanwhile, appellant sat in the back seat fashioning masks to be used in the robbery from undershirts.

The second occupied car soon left and only the two women eating lunch about seventy yards away remained. Lapas Favors and Wiley got out of the car, each armed with a pistol. Rodney Favors drove out to Church Street as agreed, and prepared to pick up Lapas and appellant at the park entrance following the robbery to expedite their getaway. Lapas Favors testified that he and Wiley crouched behind bushes and watched the two women finish lunch and prepare to leave. They waited until the women were entering their car, then put on the masks and ran toward them from their hiding place, appellant to the driver's side of the car, Lapas to the other. They

jerked open the doors and squatted in front of the women, threatening to shoot them if jewelry and handbags were not given up immediately.

The women were startled, but began to comply. The surviving victim recalled very clearly Wiley's hands as he put them out to accept her rings and a necklace. Lapas and Wiley pocketed the items but dropped a diamond ring later recovered near the car by police. Wiley then ordered the women to walk in the direction of a wooded area at the edge of the park. He emphasized his demands by motioning with his pistol. The uneven terrain over which Lapas and Wiley forced their victims caused one woman to stumble. In response Wiley assaulted her by striking her on the head and then behind the ear to make her hurry, but instead she fell under the force of the blows and Wiley kicked her as she lay. While she struggled to regain her feet Wiley commanded the women to take off their clothes "over there," meaning the woods that were now about twenty feet away and across a rough concrete culvert.

Neither woman could negotiate the culvert's steep sides alone. Lapas and Wiley pushed them down, then up the other side, which was about three feet high. On the far side they stepped into an area of trees and tangled undergrowth. Wiley again threatened to kill the women and told them to disrobe. Lapas Favors and the surviving victim both testified that at that time Wiley began to punch the woman who eventually died. She had been unable to completely remove her clothing before Wiley knocked her to the ground in a daze. She moaned and Wiley began to tear her remaining clothes away, punching, jabbing, and stomping her brutally while he did so. In describing the ferocity of the attack Lapas Favors testified that the blows "was hard enough to hurt anything." After the women were stripped, Lapas threw to the ground and tied the hands and feet of the woman nearest him, who had not yet been severely beaten. However, at that time Wiley came over and pulled the bound woman to her knees in front of him. He forced her to sodomize him and hit her in the head more than once, although she could not distinguish the exact number of times. While Wiley was so involved, the other woman gained her feet and tried to run. But she was by now so badly injured that she managed only one or two steps and pitched forward. At this time Lapas Favors ran from the scene back to the parking lot to look for his brother and the car.

Wiley took the women's clothes and threw them about thirty feet into the woods. Then he turned and picked up a stick which he used to sexually torture and stab both women. When he inserted the stick so forcefully that it broke in the surviving woman who lay helplessly tied on her stomach, his victim screamed and Wiley kicked

her many times about the face and head. During this beating she lost consciousness. Some minutes later she realized that Wiley was gone. After freeing herself from her bonds she unsuccessfully tried to revive her friend, then ran for help. Her ability to summon aid was impaired by a broken jaw and much blood blocking her mouth and throat.

Police found the murder victim at approximately 1:00 p.m. with her hands taped together behind her back. Around her ankles pantyhose were knotted tightly and her hands and feet were tied together with pantyhose. Her death was determined during the autopsy to have been caused by a fractured sternum, or breastbone, which penetrated the sac surrounding her heart. This caused a tear in the heart itself which created bleeding within the sac and prevented the heart from beating. However, the injury to her abdomen and lower body caused by the stick occurred before she died, according to expert testimony, and caused extreme pain and trauma, although probably not in sufficient amount to have caused her death directly.

Wiley fled the scene and rejoined his cousins in Rodney's car. The group drove to pawn shops and to a gold and silver dealer and sold the jewelry stolen in the robbery for about $150. They learned that Wiley had committed murder later that afternoon when news reports of the crime were broadcast on television.

Rodney Favors became fearful that his car would be traced to the park and identified by witnesses. He did not drive it for about two weeks while police sought a car similar but not identical to his. However, witnesses had made police aware of the diamond-shaped coat hanger radio antenna. After Favors began to use his car again Lapas Favors was stopped on October 8, 1981, on a routine traffic violation. The patrol officer noticed a coat hanger antenna and investigated further. Lapas Favors stepped out of the car carrying a pistol and approached the officer, but the arrest was accomplished without incident.

Based on a statement given by Lapas, police obtained warrants for the arrest of Rodney Favors and Anthony Wiley. Rodney was arrested shortly thereafter, but Wiley remained at large until October 11, when he gave himself up to police in a meeting arranged by his attorney. On that day he gave a statement, videotaped by police, which was entered into evidence at his trial.

In his statement Wiley claimed to have spent the day in question hunting for work with two friends, not the Favors brothers. These acquaintances later denied at trial that they had accompanied Wiley. According to Wiley, he met up with Rodney and Lapas late in the afternoon on September 21. He claimed to have gone to Dobbins Air Force Base and the nearby manufacturing facility of the Lockheed Corporation in Marietta to look for work but was unsuccessful

because both were closed. Security officers in charge of the entrances to Dobbins and Lockheed testified that neither was closed on September 21, 1981. Had Wiley attempted to enter Dobbins a record would have been made of the visit to the base, where security was described as "tight." Also contrary to Wiley's alibi was testimony of Mrs. Favors, mother of Rodney and Lapas (and Wiley's aunt), who saw Wiley at her apartment together with Rodney and Lapas on the morning of September 21. Raymond Wiggins, a friend of the Favors family and unacquainted with Wiley, also saw appellant at Mrs. Favors' that morning. Wiggins later picked Wiley out of a lineup.

The surviving victim could not identify Wiley in a conventional lineup. Since both men had worn masks, facial identification was impossible. However, Wiley's hands had made a distinct and clear impression on the mind of his victim and when she viewed the hands of Wiley in a novel lineup of hands only, she identified his hands as "at least very similar to the hands" she had seen on September 21.

On appeal, Wiley enumerates six errors of law committed by the trial court.

1. Wiley argues that the hand lineup procedures were unduly suggestive under the criteria imposed by Foster v. California, 394 U. S. 440 (89 SC 1127, 22 LE2d 402) (1969); and that the lineup was contrary to statutes and rules of evidence of the State of Georgia and without probative value.

a) On November 5, 1981, the surviving victim was brought to view Wiley in two separate lineups. Wiley's attorney was present and active in his role as counsel. The first lineup was a standard, physical display except that the participants wore towels to simulate the masks worn by Wiley and Lapas Favors. No identification was made at this lineup. At the second lineup, only the participants' hands were visible and at this time the witness identified Wiley's hands as "at least very similar to" those seen September 21. No person other than Wiley was on display in both lineups. The "hands only" lineup was conducted without benefit of the usual tinted, one-way glass partition between those in the lineup and the witness attempting to make an identification. Instead, a blanket was hung so as to prevent viewing of anything but pairs of hands thrust through jail bars. In this way the witness was able to observe skin tone and color which were distorted by tinted glass in the regular lineup facility. Color and tone were important because they were two characteristics which previously had been described in detail by the witness and which were remembered with great clarity along with other less salient features of the attacker's hands. Counsel objected to conducting a hand lineup at the time and to introduction of the identification made there at trial.

Appellant urges this court to hold the lineup of hands so unnecessarily suggestive and so conducive to an irreparable mistake in identification as to deny due process, citing Stovall v. Denno, 388 U. S. 293 (87 SC 1967, 18 LE2d 1199) (1967). In *Gravitt v. State,* 239 Ga. 709 (239 SE2d 149) (1977), we set out a two step test for review of identification procedures. First the court must determine whether the lineup procedure was suggestive, and second whether under the totality of circumstances the identification was reliable even though the procedure allowed misidentification. Appellant submits that the lineup procedure was inherently suggestive for two reasons: (1) only Wiley appeared in both lineups, and (2) Wiley was placed in two different positions in the two lineups.

We find that the lineup procedure was not inherently suggestive. In the first lineup, the participants were selected because of their similarity to Wiley in build and stature in order that Wiley not stand out from the others in an arbitrary and apparent way. In the hand lineup, the participants were selected for their hand characteristics for the same reason. While it is true that no participants overlapped from the first to the second lineup, a different quality of the participants was on display in the hand lineup compared to the standard lineup and the criteria for selecting them were thus adjusted. We cannot say that it would have served any purpose to have required one or more of the members of the first lineup to be in the second. Only the hands were visible in the second lineup, pushed through a fabric screen, and it was hands that the witness could not see distinctly because of tinted glass in the usual lineup room.

Wiley was placed in the lineup positions chosen by him, according to police testimony, but only in the first lineup was he allowed to choose his position, according to Wiley. We note that counsel for the appellant was present at both lineups but that Wiley had signed a waiver prior to the second lineup, giving up his demand for counsel's attendance. Wiley argues that the witness expressed interest in the person designated number five in the first lineup (Wiley was number three) of six persons, and in the second lineup he was given the number five position, the person whose hands were subsequently identified by the witness. Wiley contends this had the effect of putting a neon sign on his hands asking the witness to select them.

At the standard lineup, the witness had asked to have a closer look at the hands of numbers four, five, and six. The district attorney thereupon had all the participants step forward and present their hands to the witness. However, she was unable to see any better, since the tinted glass through which she viewed distorted certain features

of color, texture, and small details that she recalled as characteristic of her attacker's hands. Appellant argues that assigning him in the hands lineup to a number in which the witness had earlier expressed interest was suggestive. The appellant's argument is not persuasive, however, because not only were the faces of the participants covered in both lineups, but in the hand lineup the body of each participant was concealed behind a screen. Each pair of hands was tagged with a number, but the positions were not fixed in the hand lineup and the witness was free to ask the participants to move about and change positions in order to better compare one particular set of hands with another, which she did. It was only after careful juxtaposition of several sets of hands that the witness made her decision identifying Wiley. We believe that the conduct of the hand lineup gave the witness no indication of whether any persons were repeated from the earlier lineup; nor did it encourage the witness to relate Wiley's number to a certain position in the conventional lineup. Thus we do not find the assignment of numbers to the lineup of participants to be inherently or unnecessarily suggestive. Nor do we find it conducive to irreparable mistaken identification. There was no denial of due process in these procedures and the identification of Wiley was not "all but inevitable" as he contends under Foster v. California, supra. We find the lineup of hands to be a useful and supportable identification technique given the circumstances of the present case which included a clear and vivid description of the attacker's hands by an eyewitness, which description was made prior to the lineup. There is nothing in the uniqueness of the procedure to make it violative of due process.

Given the novelty of the hand lineup procedure however, and pretermitting the question of suggestiveness, we will address briefly the issue of indicia of reliability in the circumstances of the two lineups conducted in this case. In *Gravitt v. State,* supra, we recognized the five factors of reliability enumerated in Neil v. Biggers, 409 U. S. 188 (93 SC 375, 34 LE2d 401) (1972). The factors to be considered in evaluating the likelihood of misidentification include: (a) the opportunity of the victim to view the criminal at the time of the crime, (b) the witness' degree of attention, (c) the accuracy of the witness' prior description of the criminal, (d) the level of certainty demonstrated by the witness at the confrontation, and (e) the length of time between the crime and the confrontation.

Applying the above factors, we find no substantial likelihood of misidentification. While the victim was giving up her jewelry, she looked closely at Wiley's hands because the robber "put his hand in front of my face." Some minutes later his hands were at her eye level as she was pulled to her knees and forced to sodomize him. At both

these times the witness had ample opportunity to observe and her attention was focused on his hands. Her description of his hands was generally accurate and was related to the district attorney prior to the lineup. Although she was not positive of her identification beyond any doubt she was able to testify that the hands she picked in the lineup were "at least very similar to" her attacker's. While more than a month passed between the crime and the confrontation, there is no evidence that the witness' memory had faded or was confused.

We conclude that the identification procedures used in this case did not violate the appellant's due process rights. Therefore, the trial court's decision to allow such evidence to be admitted at trial was not error.

b) On the issue of the probative value of hand lineups, we hold that allowing use of a "hands only" lineup is not error. We agree with appellant's contention that such a method of identification is not permitted specifically under any of our cases or rules of evidence. Appellant thus would have us find error wherever a new procedure of identification is introduced. This approach is unnecessarily limited and likely to arbitrarily exclude potentially valuable identification methodologies. We note that physiognomic identification is not the only admissible form of witness testimony. For example, non-expert witnesses may testify to the similarity of voices heard at different times, such as during commission of a crime and during a lineup, *Arnold v. State,* 155 Ga. App. 569 (271 SE2d 702) (1980). The persuasiveness of evidence of voice or hand similarities is a question for the jury, and such evidence need not be excluded as a matter of law simply because a hand lineup is a novel identification method. A hand lineup may have probative value and it was not error to allow admission of such evidence in this case.

We distinguish the hand lineup here from scientific evidence presented by expert witnesses. This was not an identification like those accomplished by analysts of fingerprints or hair samples, *Paxton v. State,* 159 Ga. App. 175 (282 SE2d 912) (1981), which are a form of scientific evidence and require that a foundation be laid prior to expert testimony relating the samples to the accused.

2. Appellant argues that it was error to allow the state to submit Wiley's videotaped statement and then to present impeaching testimony. He contends that when the trial court allowed the taped interview into evidence during the testimony of a police investigator the effect was to make the appellant into a witness for the state. According to this rationale, the impeachment was thus violative of Ga. Code Ann. § 38-1801, which provides that a party may not impeach a witness voluntarily called by him, with certain exceptions not relevant here.

In the tape Wiley named particular persons with whom he claimed to have gone job hunting on September 21, and particular places he went in search of work but found to be closed. The state then produced these persons, who denied having been with Wiley on the day in question. The state also produced security officers from the work sites enumerated by Wiley, who testified that their regularly kept records did not reflect any visits or applications by Wiley and that they were open for normal operations on September 21, 1981.

Appellant's counsel objected generally to introduction of the tape. He did not state any grounds for his objection at trial and on appeal states only that he made "strenuous objections" to allowing the tape into evidence, without citing to the record. After searching the record we do not find that counsel stated any grounds for objection to the proffered evidence at trial which we can review on appeal. *Lackey v. State,* 217 Ga. 345 (122 SE2d 115) (1971).

We do not agree that the state called Anthony Wiley for its witness by introducing the videotape of Wiley's post-arrest statement. As a result, Ga. Code Ann. § 38-1801 is not pertinent here and we need not address the issue of whether the state could impeach Wiley's taped alibi. The state's witness was the police investigator who testified to the circumstances of the making and the content of the statement. Introduction of Wiley's videotaped statement did not render Wiley a witness for the state within the meaning of Ga. Code Ann. § 38-1801.

3. Appellant charges as error and violation of his due process rights the denial of his motion for a continuance. Appellant acknowledges that the grant or denial of a motion for continuance is left to the sound discretion of the trial court. Ga. Code Ann. § 27-2002; *Collier v. State,* 244 Ga. 553 (261 SE2d 364) (1979). However, he asserts that in the present case the trial court abused this discretion by causing the trial to commence with undue haste, thus curtailing defense counsel's trial preparations.

Wiley surrendered on October 11, 1981, accompanied by counsel. He was indicted by the Grand Jury on October 27, and identified in the lineup discussed above on November 5. On November 23 appellant's motion for continuance was denied. Trial commenced on December 8, 1981.

In similar cases denying a continuance we have found no abuse of discretion when counsel was appointed for defendant two weeks before trial, *Smith v. State,* 235 Ga. 620(3) (221 SE2d 41) (1975), and nine days before trial, *Davis v. State,* 240 Ga. 763 (243 SE2d 12) (1978). We find no abuse of discretion here. Accordingly, this enumeration of error is without merit.

4. Enumeration four is without merit.

5. Appellant contends that the state failed to adequately respond to his Brady v. Maryland, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963) motion of November 24, 1981. Counsel argues that files containing potentially exculpatory material were "dumped" on him in response to his Brady motion and that copies of certain other materials were not made available to him because the state claimed that they did not contain purely exculpatory material.

We see nothing in the record at the places cited by appellant, or elsewhere, indicating that anything in the state's files was withheld from appellant's pretrial review and private inspection. The state does not, as appellant contends, have an affirmative duty to point out to him the specifically exculpatory information contained in its investigative files where the appellant's counsel is given ample opportunity to inspect and make notes from the state's whole files. Although the volume of files may have been large, it was not so voluminous as to constitute "dumping" for the purpose of obscuring or concealing exculpatory material. *Reed v. State,* 249 Ga. 52(3) (287 SE2d 205) (1982).

6. Appellant submits that the court charge against him of possession of a firearm during the commission of a crime is a lesser included offense of the two armed robbery counts of which he stands convicted and that every element of the firearm possession count is contained in the armed robbery count.

He also submits that the count of aggravated assault for stabbing Jean Buice (the murder victim) with a stick is in fact a lesser included offense of murder, since the wound inflicted by the stabbing was described as a contributory cause of death by the medical examiner, and therefore is a part of the same transaction as the murder. We disagree with both these contentions.

The offense of possession of a firearm during the commission of a felony does not merge into the felony upon convictions for both. In 1976, the General Assembly amended Ga. Code Ann. § 26-9908a, the Code section which defines the offense of possession of a firearm during the commission of a felony. The amendment provides: "Notwithstanding any prior court decision to the contrary, any crime committed in violation of this section shall be considered a separate offense." Ga. L. 1976, pp. 1591, 1592. "Thus, there is express legislative intent to impose double punishment for conduct which violates both Code Ann. § 26-9908a and other felony statutes." *Wilson v. Zant,* 249 Ga. 373, 380 (290 SE2d 442) (1982). Such double punishment is not constitutionally prohibited, nor is it violative of our double jeopardy statutes to convict a person of both possession of a firearm during the commission of a felony and the accompanying

felony in a single prosecution.

As to the aggravated assault issue, the medical examiner testified that the victim died as a result of a broken sternum which punctured the heart sac and allowed it to fill with blood, thereby forcing the heart to stop beating. The aggravated assault was not a part of this transaction, in that it consisted of acts committed with a tree branch or stick in a separate part of the victim's body before she died and in the opinion of the expert witness was not the cause of death.

*Judgment affirmed. All the Justices concur, except Bell, J., not participating.*

DECIDED NOVEMBER 2, 1982—
REHEARING DENIED NOVEMBER 29, 1982.

*L. Paul Cobb, Jr., Robert E. McCormack III,* for appellant.

*Robert E. Wilson, District Attorney, Susan Brooks, Assistant District Attorney, Michael J. Bowers, Attorney General, Janice G. Hildenbrand, Staff Assistant Attorney General,* for appellee.