## 39620. FINDLEY v. THE STATE.

BELL, Justice.

Roger Findley (Findley) was convicted in the Superior Court of Whitfield County for the murder of his estranged wife, Gail Findley, (Gail), and was given a life sentence.

On January 16, 1982, Gail Findley was killed by five gunshot wounds to the chest. At the time of the shooting, Gail and the appellant were married, but had been separated for over a year. The appellant was living with his mother, and Gail lived in a separate

residence in the same county.

Bill Gentry, a neighbor of Findley, testified that between 6:00 and 7:00 p.m. on January 16, 1982 the appellant came to his home, told him that he had "just killed his wife," and asked him if he would "call the law." Gentry testified that when he hesitated, Findley called the Sheriff's Department himself and then went outside. He also testified that he saw a Sheriff's car pull up outside his home, pick up Findley, and drive off.

Whitfield County Deputy Sheriff Hamilton Blackstone picked up Findley at Gentry's home. Blackstone testified that when he pulled up and got out of his car, Findley walked up to him and said that he had shot his wife and that he thought she was dead. Blackstone also testified that Findley then gave him the gun he had shot her with and the key to her house. Blackstone testified that he found five spent cartridges in the gun. He then patted Findley down, put him in the front seat of the car, radioed for another officer to meet him at Gail Findley's house, and then drove to her home. Blackstone testified that a Lieutenant Swinney and a Captain Ruddell were at the house when they arrived; that he put Findley in the back of another car which had a screen; and that he then left Findley there and went up to the residence. According to his testimony, he waited outside to watch Findley while the two others went inside. He testified that when one of the ambulance personnel told him that Gail was dead, he left and drove Findley to the Correctional Center.

Swinney investigated the home, and he testified that he found Gail lying on the bedroom floor, dead from five gunshot wounds to the chest. He testified that the bedroom was connected to a bathroom, and that it looked like Gail had been dragged into the bedroom and laid down.

Findley made two statements, one oral and one written. They were admitted at trial after a determination that they had been voluntarily given. The oral statement was given to Deputy Blackstone while he was driving Findley to the Correctional Center. Blackstone testified that Findley asked him if Gail was dead and that he told Findley she was. According to Blackstone's testimony, Findley then said that "you might not believe it, ... but I really loved Gail"; that he just could not take it any more; that a couple of days before the shooting he answered the phone at his mother's home and a man asked for Gail; that he told the man he was Gail's husband and asked him what he was doing calling Gail; that the man then hung up; that when he confronted Gail with it, she admitted "she'd been going out on him"; and that as a result, he killed her.

The second statement was given to Investigator Swinney at the Correctional Center on the night of January 16, 1982. Swinney read

the statement into evidence, and according to Swinney, Findley said that after he and Gail separated, he heard she was seeing other men; that at the first of that week (the week of the murder) a man had called his mother's home asking to speak to Gail, but started stuttering and hung up when he told him he was her husband; that the morning of January 16 he went to Gail's house and told her to have her boyfriends call somewhere else; that she started raising hell so he left and went back to his mother's; that that afternoon he got a pistol and went back to Gail's where he was going to wait on the man to come and kill them both; that when he arrived, Gail was alone, and they talked for thirty to forty minutes; that Gail told him she was expecting company; that she walked into the bathroom and he followed her; that he then pulled the gun out of his back pocket and started shooting; that he then carried her into the bedroom; and that when he felt for but could not find a pulse, he locked the house and left and went to Bill Gentry's home and called the Sheriff's Department.

Randy Carnes, another neighbor of Findley, also testified against Findley at trial. Carnes testified that he and Findley went hunting about a week before the murder, and that Findley told him that Gail's boyfriends had been calling at his mother's house and aggravating him, and that he was going to go down there and kill her or do something about it because he had had all he could take.

Findley took the stand at trial. He testified that his and Gail's marital problems were the result of his mother-in-law, who helped Gail financially and had legal custody of her children. Findley testified that he and Gail had separated in the fall of 1981, but that he had tried to reconcile their marriage. He further testified that he had heard from two or three people that Gail had been dating other men, and that about three or four days before her death, a man had called his mother's home asking to speak to Gail. He testified that he told the man Gail did not live there, and that when he told him he was Gail's husband, the man stuttered and hung up. According to his testimony, Findley went to Gail's house between 5:30 and 6:00 p.m. on January 16, 1982 and took a gun with him for protection, so that if one of her boyfriends came by he could ask him to leave until he could talk to Gail. He testified that he had no intention of shooting anyone, and that the purpose of his trip was to talk Gail into getting back together and leaving Whitfield County in order to get away from Gail's mother. Findley testified that Gail told him that her mother told her that if Gail ever took Findley back, she would quit paying Gail's rent and light bill and would never let Gail see her children again. Findley testified that he then asked Gail if she was having sex with her boyfriend, and that Gail said she was and was going to

continue having sex with him. He testified that the next thing he knew, he had shot her, but that he did not even remember her leaving the kitchen where they had been sitting. He testified that after shooting her, he carried her into the bedroom, laid her down, closed her eyes, and kissed her. Findley testified that he then left her house and went to Bill Gentry's, where he called the law.

On appeal, Findley raises several enumerations of error challenging the sufficiency of the evidence, two others contending that his statements were improperly admitted, and another contending that the trial court erred in denying his motion for a new trial.

1) In enumeration of error five, Findley alleges that the trial court erred in admitting his statement to Officer Blackstone. This statement was given to Blackstone while Blackstone was driving Findley to the Correctional Center after having left Gail Findley's residence. It is undisputed that Blackstone did not read Findley his Miranda rights; that was not done until Investigator Swinney interrogated Findley later in the evening. After a Jackson-Denno hearing, the trial court determined that this statement had been volunteered by Findley, and that Blackstone did not have to give Findley his Miranda rights because he did not interrogate him. Accordingly, the trial court admitted the statement.

On appeal, Findley argues that his statement was the result of a custodial interrogation by Blackstone, and that the failure of Blackstone to read him his Miranda rights should have rendered the statement inadmissible. We agree that if in fact Findley was in custody and being interrogated, his argument is correct, since the admissibility of statements given during a custodial interrogation is predicated upon the state showing that the defendant was informed of and waived his Miranda rights. Miranda v. Arizona, 384 U. S. 436, 475-476 (86 SC 1602, 16 LE2d 694) (1966); *Cash v. State,* 224 Ga. 798 (1) (164 SE2d 558) (1968).

The issue of whether a statement was the result of an interrogation or was instead volunteered is a factual determination for the trial court and will not be disturbed on review unless clearly erroneous. *Cofield v. State,* 247 Ga. 98 (4) (274 SE2d 530) (1981); *Dampier v. State,* 245 Ga. 427 (3) (265 SE2d 565) (1980); *Gates v. State,* 244 Ga. 587 (1) (261 SE2d 349) (1979).

In this regard, Blackstone testified at the Jackson-Denno hearing that he did not ask Findley any questions about the shooting, and that he told Findley not to tell him anything about it. He testified that he only asked Findley if he was going to be okay and if he was feeling sick because Findley looked like he was going to vomit. He testified that Findley asked him if Gail was dead, and that he told him

she was. He testified that Findley then told him about the phone calls from boyfriends and the other circumstances surrounding the shooting. Blackstone also testified that Findley was calm and did not appear to be on any kind of drugs.

In response, Findley testified that on the way to the Correctional Center Blackstone asked him "how it all got started." He testified that he did not feel like talking, but that Blackstone kept asking him questions until he finally "got to talking."

In light of the above evidence, we cannot conclude that the trial court clearly erred in resolving the conflict between Findley's and Blackstone's testimonies by concluding that Findley had not been interrogated, but had instead volunteered the information given. *Cofield v. State,* supra; *Beeks v. State,* 225 Ga. 200 (2) (167 SE2d 156) (1969). Consequently, this enumeration of error has no merit.

2) Regarding his statement to Investigator Swinney, Findley contends that the trial court erred in ruling that he made a knowing and intelligent waiver of his Miranda rights. Miranda v. Arizona, supra, p. 475. Again, whether a defendant was capable of making and did make a knowing and intelligent waiver of his Miranda rights is a factual and credibility determination for the trial court relating to the admissibility of a confession and will not be disturbed on appeal unless clearly erroneous. *Gates v. State,* supra, pp. 590-591; *Miller v. State,* 240 Ga. 110, 111-112 (239 SE2d 524) (1977); *Hurt v. State,* 239 Ga. 665 (2) (238 SE2d 542) (1977).

Relative to this determination, Investigator Swinney testified at the Jackson-Denno hearing that before questioning Findley he advised him of his constitutional rights under Miranda v. Arizona, supra, and read him the contents of a waiver certificate which Findley subsequently signed. Swinney testified that Findley did not appear to be on drugs or intoxicated; that Findley said he understood his rights, and that when he asked Findley if there was anything he did not understand, Findley said there was not. Findley was advised of his Miranda rights and gave his statement at about 9:30 p.m. on January 16, 1982, approximately two hours after being taken to the Correctional Center. As already noted, Officer Blackstone also testified that Findley acted calm and did not appear to be on any drugs.

Findley contends that he was incapable of making a knowing and intelligent waiver of his constitutional rights because of the drugs he had taken during the course of the day and because of his emotional condition following the shooting. He testified that he had smoked seven or eight joints and snorted a dime of THC during the day, but that he did not know the effect these drugs had on him. He also testified that he was very upset over the shooting and was not

thinking clearly; that he did not care what he said as long as he died; and that he did not knowingly and intelligently waive his rights.

We find that the above evidence was sufficient for the trial court to conclude that even if the defendant had taken drugs, their influence, coupled with his emotional condition, did not render him incapable of understanding his rights and making a knowing and intelligent waiver thereof. Accordingly, we find that the trial court did not err in finding the confession to be admissible. *Gates v. State,* supra; *Miller v. State,* supra; see, *Strickland v. State,* 250 Ga. 624 (2) (300 SE2d 156) (1983).

3) In two related enumerations of error, Findley challenges the sufficiency of the evidence, contending that the state did not prove malice aforethought or the cause of death beyond a reasonable doubt. We disagree. After reviewing the evidence in a light most favorable to the jury's verdict, we conclude that a rational trier of fact could reasonably have found the essential elements of the crime beyond a reasonable doubt, and consequently, that Findley was guilty of murder beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Strickland v. State,* supra, p. 625.

4) In his last enumeration of error, Findley argues that the trial court erred in not granting his motion for a new trial because there was newly discovered evidence that Randy Carnes' testimony at trial was not true and was the result of prosecutorial misconduct.

The standard for granting a new trial on the basis of newly discovered evidence is well established. *Drake v. State,* 248 Ga. 891 (1) (287 SE2d 180) (1982); *Stroud v. State,* 247 Ga. 395 (276 SE2d 597) (1981); *Timberlake v. State,* 246 Ga. 488 (271 SE2d 792) (1980). In *Timberlake,* this court held that " 'It is incumbent on a party who asks for a new trial on the ground of newly discovery evidence to satisfy the court: (1) that the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that he did not acquire it sooner; (3) that it is so material that it would probably produce a different verdict; (4) that it is not cumulative only; (5) that the affidavit of the witness himself should be procured or its absence accounted for; and (6) that a new trial will not be granted if the only effect of the evidence will be to impeach the credit of a witness.' " *Timberlake v. State,* supra, p. 491. All six of these grounds must be satisfied to secure a new trial. Id. p. 491.

As previously noted, Carnes testified at trial that Findley told him that Gail's boyfriends had been irritating him by calling his mother's house, and that he was going to kill her or do something about it because he had had all he could take. At the hearing on the motion for new trial, Carnes testified that that was what he originally told the district attorney, but that before trial he met the district

attorney in the hall and told him that "[he] really didn't give it much of [sic] thought and [he] couldn't really swear if Roger [the appellant] really said that he was gonna [sic] go kill her, but he did say the rest of that." Carnes then testified at the hearing that he never gave his trial testimony that much thought because he had never been involved in anything like that before. Carnes also testified that the district attorney got upset with him because he thought Carnes was going to change his testimony. Carnes testified that the district attorney then called up the fire chief, Carnes' boss, and that the three of them had a meeting during which the fire chief and the district attorney asked him what his testimony was going to be, cussed him, and threatened that he could lose his job and be called a liar the rest of his life. In conclusion, defense counsel asked Carnes if he could swear what he testified to at the original trial was true, and Carnes responded "Well, Roger [the appellant] may have said that; but, see, it's been so long, I don't really know. . . . But I don't guess I would have got up and said what I said if it hadn't been for Mr. Partain [the district attorney]. . . ." On cross at the motion for new trial, Carnes testified that Findley could have said that he was going to kill his wife, but that he was not sure, but that that was what he originally told the district attorney.

On appeal, a trial court's denial of a motion for new trial will not be disturbed unless it affirmatively appears there was an abuse of discretion. *Drake v. State,* supra, pp. 894-895. In the instant case, we find no such abuse because Findley has not shown that this "newly discovered evidence" was so material that it would probably produce a different verdict. Findley argues that Carnes' testimony at trial was the strongest evidence of malice aforethought and that without it, the jury would probably return a verdict of voluntary manslaughter. However, the trial court disagreed with this contention, and we conclude that he was justified in doing so because Carnes' repudiation of his testimony was so equivocal and because both of Findley's statements to law enforcement officers constituted strong evidence of malice aforethought. For this reason, we find that the trial court did not err in refusing to grant Findley's motion for new trial.

*Judgment affirmed. All the Justices concur.*

DECIDED JULY 7, 1983.

*Harlan M. Starr,* for appellant.
*Stephen A. Williams, District Attorney, Michael J. Bowers, Attorney General, Janice G. Hildenbrand, Staff Assistant Attorney General,* for appellee.