40841. CROMER v. THE STATE.
(320 SE2d 751)

BELL, Justice.

The appellant, Robert Cromer, was convicted of the murder of Harold McKinnon and received a life sentence. His motion for new trial was denied, and he now appeals. We affirm.

Testimony established that Harold McKinnon went home about 4:00 a.m. on the morning of June 20. Paul Hawke, who had been with

Harold that evening, testified that he stopped by Harold's home about 6:00 a.m., and that, although Harold's car was there, no one answered the door. Kim McKinnon, the victim's daughter, testified that at about 11:30 a.m. on June 20 she stopped by her father's home and found him lying in his bed, with a gunshot wound to the head. Dr. Larry Howard of the State Crime Lab testified that Harold died from a single gunshot wound to the head, and that the muzzle to target distance was 12 to 18 inches. A bullet was recovered from the pillow under Harold's head.

Cromer and Kim McKinnon lived together in a trailer near Oglethorpe, Georgia. As of the date of the murder they were planning to marry, and have now become engaged. On Saturday night, June 19, 1982, they went to Jimmy Mac's Lounge in Americus, Georgia, where they saw Mary Green. Green testified that she and Kim discussed the problems of Kim's father's disapproval of her relationship with Cromer and of his plan to take her out of his will because of that relationship. She said that Cromer was listening to the conversation, and interjected that "he didn't want nothing the son-of-a-bitch had anyway." Although Cromer confirmed that he and Kim saw Mary Green at Jimmy Mac's Lounge, and admitted that he told Kim and Mary Green that he did not need anything Harold had, he denied having called Harold McKinnon a son-of-a-bitch. Kim testified that she and Cromer stayed at Jimmy Mac's until approximately 11:30 p.m., at which time they went home and went to bed. She said that Cromer did not leave home that night. Cromer testified to the same sequence of events as Kim, but added that after he and Kim arrived home from Jimmy Mac's, he stayed there until about 11:30 a.m. on June 20.

William Marvin Lund, Cromer's brother-in-law, was granted immunity by the state in exchange for his testimony. He testified that approximately one and one-half weeks before the shooting, Cromer told him that he could make some easy money by getting rid of somebody. He said that Cromer did not specify who the person was, and that the conversation went no further. According to Lund, however, the Wednesday following that initial discussion Cromer told him he could make easy money by killing Harold McKinnon. Lund testified that Cromer said he wanted Harold dead because Kim would recover a large sum of insurance money. Lund agreed to help, and Cromer picked him up about 2:00 a.m. on June 20. He testified that Cromer had a pistol, and requested that Lund kill McKinnon. According to Lund, however, he told Cromer that he could not kill Harold, and Cromer then stopped the car and said that "he had to get the job done because he heard that Harold . . . was going to knock Kim out of his will." Lund switched to driver and Cromer to passenger, and they proceeded to Harold's house, where Lund let Cromer, armed with a pistol, out of the car. Lund testified that he then drove to a

nearby church, where he waited for Cromer about an hour, before leaving and driving by McKinnon's house. Not seeing Cromer or any activity at the house, he returned to the church. Shortly thereafter he saw Harold McKinnon's black Lincoln Continental drive by, headed toward McKinnon's house. Lund testified that about a half hour later Cromer came running to the car, jumped in, and said, "Let's go, the job's done." They then drove to Lund's residence, where Cromer gave Lund the gun, saying that if Lund got rid of it and did not talk, Cromer would give him $5,000. Lund testified that he took the gun with him to his mother's home in Burnsville, Minnesota, where he cleaned it and hid it in a heating duct in her garage.

William Lund's sister, Jackie Lund, who lives in Minnesota near her mother, testified that in July 1982 William came to their mother's home. She testified that she saw William cleaning a .38 caliber pistol, and that when she asked him about it, he told her that it "was his ace in the hole" and that he was to receive $4,000 from Cromer for hiding it because it was used in a murder. She testified that William told her that Cromer was to receive $20,000, and that Cromer had masterminded the plan and he had been the lookout.

Lund was arrested when he returned to Georgia. According to Sheriff Charles Cannon of the Macon County Sheriff's Department, Lund initially denied any knowledge of the murder, and a search of his car did not reveal a .38 caliber pistol. However, on August 9, 1982, Lund, although denying any personal involvement in the murder, admitted that he knew of the murder; that Cromer gave him a .38 caliber revolver on the morning of June 20, 1982 and asked him to dispose of it; and that he left that revolver at his mother's home in Minnesota. The revolver was recovered from Minnesota, and a state crime lab analyst testified that the bullet found in the victim's pillow could have been fired from that revolver.

Carla Lund, the appellant's sister and William Lund's wife, testified that the appellant told her he had killed McKinnon.

1. Although Cromer does not contest the sufficiency of the evidence, we find that, viewing the evidence in a light most favorable to the jury's verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. a. In his first enumeration of error Cromer raises two related issues. He first argues that the trial court erred in denying his request for state funds to hire an investigator to interview two prospective witnesses in Minnesota and to fly those same two witnesses to Georgia to testify. At a pre-trial hearing Cromer argued to the court that his motion should be granted because the two witnesses, Delores Batzlaff, Cromer's mother, and John Soulier, Cromer's brother-in-law, had information helpful to the defense. Specifically, he alleged that

William Lund had made statements to the two witnesses incriminating himself as the murderer of Harold McKinnon, and that those two witnesses might also offer testimony which would impeach certain aspects of the testimony of William Lund.

We find no error. The grant or denial of Cromer's motion for funds lay within the sound discretion of the trial court, and unless the trial court abused its discretion in denying that motion, we will not disturb its decision on appeal. *Tucker v. State*, 249 Ga. 323 (3) (290 SE2d 97) (1982); *Ennis v. State*, 249 Ga. 222 (2) (290 SE2d 50) (1982); *Cunningham v. State*, 248 Ga. 558 (4) (284 SE2d 390) (1981). Here, the defense alleged Batzlaff and Soulier could provide material information. When asked by the trial court to substantiate those allegations, defense counsel responded that he could not do so without the witnesses present. In an effort to assist the defense, the trial court ordered that a telephone conference be set up between defense counsel and Batzlaff, and stated that if the conference uncovered any information favorable to the defendant, it would consider having her flown to Georgia to testify. It appears, however, that the defense neither availed itself of that opportunity nor took the further step of seeking a conference with John Soulier as well as Batzlaff. Additionally, interviews of John Soulier and Delores Batzlaff by police investigators in Minnesota, which were provided to defense counsel, revealed no information similar to the testimony the defense alleged those witnesses would offer.

Under these circumstances, we find that the trial court did not abuse its discretion in denying Cromer's request for funds.

b. It appears that in his first enumeration of error Cromer is also arguing that the trial court should have granted his motion for a continuance so that Batzlaff and Soulier could be flown to Georgia and interviewed by him before trial. Whether to grant or deny a motion for a continuance lies within the discretion of the trial court. *Wiley v. State*, 250 Ga. 343 (3) (296 SE2d 714) (1982). As has already been noted, Cromer failed to demonstrate the defense's need to have these two witnesses present, despite the opportunity granted by the trial court to do so; therefore, we cannot conclude that the trial court abused its discretion in denying Cromer's motion for a continuance.

3. In his second enumeration of error Cromer argues that the trial court erred in permitting the state to introduce testimony that it conditioned its recommendation for a grant of immunity to William Lund upon his submission to a polygraph examination.

During the cross-examination of Sheriff Cannon, defense counsel questioned the sheriff about discrepancies in a series of statements given by Lund to the police, about whether the sheriff now felt Lund was telling the truth, and about the circumstances surrounding the sheriff's promise to recommend immunity for Lund. Immediately fol-

lowing the defense's cross-examination of Sheriff Cannon, the state requested a hearing out of the jury's presence. At that hearing the state contended that the defense had raised an issue concerning Sheriff Cannon's conduct in promising to recommend immunity for Lund. The state contended that because the defense raised that issue, the state had the right, pursuant to *Herlong v. State*, 236 Ga. 326 (3) (223 SE2d 672) (1976), to question Sheriff Cannon concerning the conditions precedent to the state's promise, which included a condition that Lund give a full and complete statement tested by a polygraph examination. The trial court agreed, and ruled that the state could elicit testimony to that effect, but that the state could not refer to the results of that exam. The trial judge then instructed the jury that lie detector tests are unreliable and have no bearing on veracity in legal proceedings, and that he was going to permit the sheriff to refer to a polygraph examination in order to explain his conduct. On appeal Cromer contends that the trial court's ruling on this issue was erroneous. We disagree.

In general, it is impermissible for the state to bolster the credibility of a state's witness or impugn the credibility of the defendant by eliciting testimony to the effect that the witness or the defendant were administered polygraph examinations. See, e.g., *Stack v. State*, 234 Ga. 19, 23-25 (214 SE2d 514) (1975); *Williams v. State*, 251 Ga. 749 (15) (312 SE2d 40) (1983). In the instant case the statement offered by Sheriff Cannon to explain his conduct — that he required Lund to submit to a polygraph examination before he promised to recommend immunity for Lund — raises the inference that Lund passed the lie detector test. That inference bolsters Lund's credibility and, considered in isolation, would thus be prejudicial to Cromer. See *Williams v. State*, supra, 251 Ga. 749. For the reasons which follow, however, we find no error in the trial court's ruling.

In *Herlong v. State*, supra, 236 Ga. 326, we found that it was not error to admit testimony by a police officer that an arrest warrant was issued for the defendant after a state's witness was given a lie detector test. We held that such testimony was admissible to explain the officer's conduct. Id. at 328-329. The scope of *Herlong* has been somewhat limited by implication in *Momon v. State*, 249 Ga. 865 (294 SE2d 482) (1982), in which we restricted the application of OCGA § 24-3-2 to instances "[w]hen . . . the conduct and motives of the actor are matters concerning which the truth must be found (i.e., are relevant to the issues on trial), . . . ." *Momon*, supra, 249 Ga. at 867. Applying the holding of *Momon* to the facts of *Herlong*, it is clear that this court would no longer consider the conduct and motives of the actor in *Herlong* to be relevant to the issues on trial. See, e.g., *Momon*, supra, 249 Ga. at 866-867; *Gaskins v. State*, 250 Ga. 386, 390-391 (297 SE2d 729) (1982); *Teague v. State*, 252 Ga. 534 (1) (314

SE2d 910 ) (1984). However, the principle of *Herlong* retains vitality, as the relevance of an actor's conduct and motives must be evaluated in light of the facts and circumstances of each case.

Here, the trial court's ruling fits within the rule of *Herlong*. We find that the defense's cross-examination of Sheriff Cannon put in issue the question of whether Sheriff Cannon might have tampered with William Lund, a key witness for the prosecution, and might have acted improperly in recommending that Lund be granted immunity. Moreover, the trial court instructed the jury that it could consider the sheriff's testimony concerning the lie detector test for the proper purpose of explaining the sheriff's conduct and motives, but not for the improper purpose of reflecting on the credibility or veracity of witnesses. See Justice, now Chief Justice, Hill's dissent in *Herlong v. State*, supra, 236 Ga. at 330. For this reason, the trial court correctly allowed Sheriff Cannon to explain that, before he recommended immunity for Lund, he required Lund to give a complete statement of the events surrounding the death of Harold McKinnon subject to a polygraph examination. (Cf. *Mincey v. State*, 251 Ga. 255 (12) (304 SE2d 882) (1983); *Ivester v. State*, 252 Ga. 333 (2) (313 SE2d 674) (1984)).

Under the circumstances of this case we find no merit to this enumeration of error.

4. In his third enumeration of error Cromer argues that the trial court erred in permitting, over his objection, hearsay testimony from Jackie Lund and Charles Anderson concerning statements made to them by William Lund. We find no error. Hearsay statements made by a conspirator during the course of a conspiracy, including the concealment phase, are admissible against all conspirators. OCGA § 24-3-5; *Fortner v. State*, 248 Ga. 107 (2) (281 SE2d 533) (1981); *Gay v. State*, 249 Ga. 747 (3) (294 SE2d 476) (1982). Here, there was ample evidence of a conspiracy between Cromer and Lund to murder Harold McKinnon, see *Cunningham v. State*, 248 Ga. 835 (1) (286 SE2d 427) (1982). The statements made by William Lund to Jackie Lund and Charles Anderson were made during the concealment phase of that conspiracy, and were thus admissible against Cromer. *Fortner v. State*, supra; *Gay v. State*, supra.

5. In his fourth enumeration of error Cromer argues that he was entitled to a new trial on the basis of newly discovered evidence, and that the trial court erred in not so ruling. We disagree. Cromer alleges that the newly discovered evidence consists of statements William Lund made to two other prisoners while in jail admitting that he committed the murder of Harold McKinnon, and of a statement Carla Lund made to her sister after the trial to the effect that she lied on the witness stand. Cromer clearly failed, however, to satisfy one of the requirements for the grant of a new trial on the basis of newly

discovered evidence, in that he failed to submit affidavits to the trial court from the two prisoners or from Carla Lund's sister, or to account for the lack of affidavits from those witnesses. See *Findley v. State*, 251 Ga. 222 (4) (304 SE2d 898) (1983); *Drake v. State*, 248 Ga. 891 (1) (287 SE2d 180) (1982). Thus, the trial court did not err in denying Cromer's motion for a new trial on the basis of newly discovered evidence.

6. In his fifth enumeration of error Cromer argues that the state withheld exculpatory information from him in violation of Brady v. Maryland, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963). Specifically, he alleges that Charles Anderson, who testified at trial as to a conversation involving William Lund, gave pre-trial statements concerning the date of that conversation which were inconsistent with his trial testimony. We find no error because Cromer has only made bare allegations that such an inconsistent statement was available to the prosecution. He "has not come forward with anything to suggest a suppression of material, exculpatory information by the state. The burden is on the appellant to establish a Brady violation (See e.g., *Hicks v. State*, 232 Ga. 393, 396 (207 SE2d 30) (1974), and this burden has not been satisfied in the instant case." *Hill v. State*, 248 Ga. 304 (2) (283 SE2d 252) (1981).

*Judgment affirmed. All the Justices concur, except Smith, J., who concurs in the judgment only, and Weltner, J., who concurs specially.*

DECIDED OCTOBER 1, 1984.

*Chew & Lamberth, Donald L. Lamberth,* for appellant.
Robert L. Cromer, *pro se.*
*John R. Parks, District Attorney, Michael J. Bowers, Attorney General, Eddie Snelling, Jr.,* for appellee.

WELTNER, Justice, concurring specially.

I write this special concurrence only to suggest that the questioned testimony of Sheriff Cannon relative to the polygraph examination comes properly within the scope of OCGA § 24-3-2, as defined by *Momon v. State*, 249 Ga. 865 (294 SE2d 482) (1982). The defense undertook, in cross-examination, to inquire into the sheriff's present view of the truthfulness of the witness, and the circumstances of his recommendation for immunity. Hence, "the conduct and motives of the actor [Sheriff Cannon] are matters concerning which the truth must be found. . . ." *Momon,* supra, 249 Ga. at 867, having been made so by the defense.

That would render admissible not only the fact of the polygraph examination, but the result as well, so long as it is shown that the

sheriff's conduct was based upon these factors.