## 43584. QUICK v. THE STATE.
### (353 SE2d 497)

CLARKE, Presiding Justice.

Joseph Quick was convicted of murder by a Liberty County jury and sentenced to die. He now appeals, raising ten enumerations of error.[1]

### Facts

The victim, Larry Dupree, worked as an undercover drug agent for the Liberty County Sheriff's Office, and was scheduled to testify in a number of cases involving the defendant's employer, Cal Armfield.

Early in the evening of June 16, 1985, as Dupree and his wife sat

---

[1] The jury returned its verdict as to sentence on January 16, 1986. A motion for new trial was filed February 14, 1986 and amended on April 3, 1986, on which date the motion was heard. The motion was denied on May 9, 1986, and the case was docketed in this court on June 5, 1986. The case was orally argued September 10, 1986.

in their car in the driveway of their home, preparing to leave, a shotgun-wielding assailant came around the corner of their trailer and approached the driver's side window of their car. Mrs. Dupree, the driver, was bent over to adjust her seat, and looked up just in time to see the assailant point the shotgun at the window and fire. The assailant immediately ran away.

The shot struck Larry Dupree on the left side of the neck, lacerating his voice box and a major artery in his neck, and within a matter of minutes causing his death. The autopsist recovered from the body two pieces of wadding (the presence of which indicated a muzzle-to-target distance of six feet or less) and a lead slug.

Mrs. Dupree described the assailant to sheriff's investigators and told them that she did not know the assailant's name, but he had been a customer on several occasions at a fast-food restaurant where she was employed, and she would recognize him if she saw him again.

The investigators, agreeing that the description given to them by Mrs. Dupree sounded like Joseph Quick, proceeded to his residence in a trailer park owned by Cal Armfield.

Meanwhile, a detective experienced in tracking followed the tracks of the assailant approximately one-half mile to the residence of Cal Armfield's mother. Nearby, he found a .12 gauge Winchester Super X shell casing, labeled one ounce (indicating a "slug load").

Quick consented to a search of his residence, and investigators seized clothes matching the description given by Mrs. Dupree, and shoes having a tread design, size, and shape consistent with the tracks observed leading away from the crime scene.

Mrs. Dupree identified Quick from a "mug book," and subsequently picked him out of a lineup.

During the incarceration following his arrest, the defendant wrote the following letter:

"Cal Armfield

"There's a car up here car lot beside McDonald there a between 77-80 I want you to get in my wife name Mrs. Gloria Lee Quick and insurance Now I figure between Sat. after visiting and Sunday you will get this message, of course you think you got it figure out so you will be stupid enough to don't do what I say this time Well the last one my wife talk me outer doing what I was going to do turn you in Not this time because if this time schedule isn't met I will have Det. Dasher and Sike to come to the sail and give them the information they want and testify against you I'm tire of your . . . You . . . me around and my wife but if by Thursday visiting day when she come and don't be driving her own car and money from you to give me before she leave I will get the bailer to make that call and put the Detective on you Mr. Bad . . . You is going to pay me or go to prison

. . . They want you not me but of course you got it figure out right?

"You . . . my family around so far because of my wife is the reason you isn't already up here . . . over me. Concerning that trailer and my cloths changing your phone number well if my wife don't have her on car Thursday I'm going to show you what can happen smart . . ., let you sit up in here You won't make no bond on no contact killing.

"So let's see Cal James Armfield you noticed I know your whole name The detective told me and with my help they can nail you without if you is cool Now only till Thursday Mr. Cal James Armfield dig? Jimmie Joe." (Profanity deleted.)

### Enumerations of Error

1. In his 3rd enumeration of error, Quick argues that the identification by Mrs. Dupree was unreliable and should have been suppressed. We find here no impermissibly suggestive photographic display or line up procedures, nor any substantial likelihood of misidentification. See *Wiley v. State*, 250 Ga. 343 (1) (296 SE2d 714) (1982); *Rivers v. State*, 250 Ga. 303 (4) (298 SE2d 1) (1982). The trial court did not err by allowing Mrs. Dupree to testify.

2. In his 4th enumeration, Quick contends the evidence does not support his conviction for murder. This contention is premised upon the success of his 3rd enumeration of error. Inasmuch as we find no merit to enumeration 3, we find no merit to this one. The evidence supports the conviction. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

3. Quick's first two enumerations relate to the voir dire.

(a) He argues that a juror opposed to the death penalty was improperly excused. We disagree. The juror testified initially that "The idea of being responsible for another person's life would be hard for me to deal with . . . I don't honestly know whether or not I could live with the decision that I was responsible for . . . being one of the persons responsible for a guilty verdict." She testified that she thought her attitude towards the death penalty would prevent her from making an impartial decision as to the defendant's guilt. On examination by the district attorney, she testified that her attitude toward the death penalty would (1) cause her to vote against it no matter what the evidence, (2) prevent her from making an impartial decision based on the evidence, and (3) make it impossible to subordinate her feelings against the death penalty to the oath she would take as a juror to follow the instructions of the court.

Against all this, Quick can point only to her testimony that she "would try" to put her feelings aside but did not "know that [she] could."

We do not agree that this juror merely expressed "qualms" about capital punishment. The trial court was authorized on this record to find that her views on capital punishment would prevent or substantially impair the performance of her duties as a juror in accordance with her oath and the instructions of the court. *Alderman v. State*, 254 Ga. 206 (4) (327 SE2d 168) (1985). See also *Curry v. State*, 255 Ga. 215 (2 e) (336 SE2d 762) (1985).

(b) Quick complains of the court's failure to ask the statutory voir dire questions contained in OCGA § 15-12-164 to the fourth panel of jurors. This oversight was not brought to the court's attention at trial. Absent a timely objection, we find no reversible error. *Gober v. State*, 247 Ga. 652 (2) (278 SE2d 386) (1981); *Smith v. State*, 168 Ga. 611 (4) (148 SE 531) (1929). We note that both parties had ample opportunity during the sequestered voir dire proceedings to ask any questions which might establish bias or prejudice on the part of any of the prospective jurors. See *Jordan v. State*, 247 Ga. 328 (6) (276 SE2d 224) (1981).

4. A Liberty County jail supervisor testified on behalf of the state that she had observed the defendant's writing on a number of occasions; the defendant had signed his name and filled out various questionnaires in her presence while in custody pending the trial of this case. She testified that she was familiar with his writing and would recognize it, and identified the handwriting on the letter to Cal Armfield as the defendant's.

In his 5th enumeration, Quick argues that the letter should have been excluded because it was irrelevant, and because the handwriting was not sufficiently identified as his. We cannot agree.

"Proof of handwriting may be resorted to in the absence of direct evidence of execution. In such a case, any witness who shall swear that he knows or would recognize the handwriting shall be competent to testify as to his belief. The source of his knowledge shall be a question for investigation and shall go entirely to the credit and weight of his evidence." OCGA § 24-7-6.

"A nonexpert witness may identify the handwriting of a particular individual (as he would identify the individual himself), provided he knows the handwriting or is so familiar with it that he would recognize it. [Cit.]" *Copeland v. State*, 66 Ga. App. 142, 143 (4) (17 SE2d 288) (1941).

"The letter was relevant, and that it was in the handwriting of the accused was sufficiently proved to warrant the court in admitting it in evidence as a document emanating from him." *Rumph v. State*, 91 Ga. 20, 21 (16 SE 104) (1892).

5. Six months after his arrest, and a month before his trial began, Quick was caught attempting to escape by digging or chipping out the concrete from around his cell window. Evidence of this attempt was

admitted at trial. In his 6th enumeration, Quick contends this evidence should have been excluded, on the ground that the attempt was too remote in time from the commission of the crime to be relevant.

As the defendant concedes, "the great weight of authority in this state is contrary to this position." See, e.g., *Welborn v. State*, 236 Ga. 319 (1) (223 SE2d 698) (1976); *Johnson v. State*, 188 Ga. 771 (2) (4 SE2d 639) (1939). We find no error.

6. Just as the jury deliberations were to begin at the sentencing phase of the trial, the foreman delivered to the court the following note: "We have a juror who is afraid for her life. She lives in the neighborhood of [Cal] Armfield . . . Do you think the Court should know this, possibly excuse her?"

At a bench conference, Quick's attorney stated, "If it would relieve her, that's fine with me, your Honor." The district attorney agreed.

The court excused the juror and substituted an alternate.

After the jury returned its verdict recommending a death sentence, the defendant for the first time expressed concern about the incident and moved to empanel another jury to consider the issue of sentence.

On appeal, the defendant concedes that his objection was late, but contends that the court should have declared a mistrial, sua sponte, instead of merely excusing the one juror.

He argues that the communication by this juror to the others was "tantamount to an unauthorized contact which takes place between a juror and a third party . . . the remaining jurors have received information about the case that is not in evidence." This irregularity, he contends, is of "such grave importance" as to excuse his raising the issue late.

Here the defendant did not merely fail to object to the excusal of the juror, he actively acquiesced in the court's action.

Moreover, it has not been shown that the remaining jurors received information about the case that was not in evidence. The concerns of the juror who lived in the same neighborhood as Cal Armfield very likely resulted from information in evidence establishing that Armfield had hired the defendant to murder a state witness.

The court did not err by excusing the juror with the agreement of the parties, or by failing to declare a mistrial on the court's own motion.

7. The § b (4) statutory aggravating circumstance was the only *statutory* aggravating circumstance contended for by the state in this case. See OCGA § 17-10-30 (b) (4). The state did, however, offer, as *additional* evidence in aggravation, proof that Quick had a prior record of conviction for assault with intent to murder and for burglary. See OCGA § 17-10-2.

The jury initially returned a sentencing verdict which read: "We the jury find the following statutory aggravating circumstances to exist beyond a reasonable doubt: One, the offender committed the offense of murder for another for the purpose of receiving money or other things of monetary value; two, prior conviction of assault with intent to murder; three, prior conviction of burglary in the second degree; and recommend that the defendant, Joseph Quick, be sentenced to death by electrocution . . ."

The jury was returned to the jury room with instructions that although the defendant's prior record could be considered in aggravation, it was not a statutory aggravating circumstance which would warrant the imposition of a death sentence.

After further deliberations, the jury returned a verdict in proper form, specifying a finding of one statutory aggravating circumstance, that the offender "committed the offense of murder for the purpose of receiving money or other things of monetary value."

In his 8th enumeration, the defendant contends the jury improperly considered the two noncapital felony convictions as statutory aggravating circumstances, thereby giving undue emphasis to this prior record in making its determination as to sentence.

This argument would have more weight if the court had accepted the first verdict. The court did not, and in view of the court's specific instructions that the defendant's prior record did not constitute statutory aggravating circumstances, and the jury's subsequent return of a verdict showing that it understood these supplemental instructions, the "mere fact that some of the aggravating circumstances were improperly designated 'statutory' " in the jury's initial verdict clearly had "an inconsequential impact on the jury's decision regarding the death penalty." *Zant v. Stephens*, 250 Ga. 97, 100 (297 SE2d 1) (1982). We find no reversible error here.

8. Contrary to the defendant's 9th enumeration, the evidence — including the letter to Cal Armfield, and evidence that the defendant was employed by Armfield, that footprints led from the scene of the murder to Armfield's mother's residence, and that the victim was to have been a witness in several drug cases against Cal Armfield — supports the jury's finding of the § b (4) statutory aggravating circumstance.

9. During its deliberations at the sentencing phase of the trial, the jury sought to learn whether it could somehow ensure that the defendant remain in prison for the rest of his life. The court responded:

"Madam Foreman, ladies and gentlemen of the jury, the Court has received the note: If we find guilt with aggravated circumstance and recommend mercy, can we also recommend parole not be granted or can we recommend life and a day or some other sentence that

would preclude parole?

"The Court instructs you as follows: That the sentence form that has been handed you is the form that has to be completed. And, while you may make any additional recommendations that you might desire, either on the back side of that form or on a separate sheet of paper and the Court would have those to pass along to the Department of Corrections, the Court would instruct you that you're bound within the limits that the statute itself provides, and we have furnished you that information.

"Once a defendant is placed in — with the Department of Corrections, the determination as to the housing, place, conditions, all of these things are determined by the Department of Corrections. The issue of parole, under the laws of the state of Georgia — pardon and parole — are solely within the discretion of the State Board of Pardons and Paroles.

"Your recommendations would be made to them and would be a part of the record of the defendant, but they would not be binding on the Department of Corrections or on the Pardon — Board of Pardons and Paroles."

The defendant objected to the charge, and in his 10th enumeration of error, contends that the charge given here violates the policy of this state forbidding "argument or charge" on the possibility of parole, *Horton v. State*, 249 Ga. 871, 873 (4) (295 SE2d 281) (1982), as expressed in OCGA § 17-8-76 (a), and followed consistently by this court. See, e.g., *Davis v. State*, 255 Ga. 598 (25) (340 SE2d 869) (1986); *Horton v. State*, supra; *McGruder v. State*. 213 Ga. 259, 266-67 (98 SE2d 564) (1957); *Strickland v. State*, 209 Ga. 65 (70 SE2d 710) (1952); *Thompson v. State*, 203 Ga. 416 (47 SE2d 54) (1948).

The Prosecuting Attorneys' Council of Georgia, argues, amicus curiae, that OCGA § 17-8-76 "has been by-passed and rendered obsolete and inappropriate by more modern criminal legislation in Georgia," and that we should reconsider our opinion in *Davis v. State*, supra.

If the Council is suggesting that OCGA § 17-8-76 has been implicitly repealed, we do not agree. Nor may we simply ignore the statute. Moreover, we note that our present policy is consistent with the position taken by the majority of jurisdictions in this country. See Annot., Prejudicial Effect of Statement or Instruction of Court as to Possibility of Parole or Pardon, 12 ALR3d 832.[2]

---

[2] At least one jurisdiction that experimented with allowing the court to instruct the jury on the possibility of parole in capital cases, "to assist [the jury] in assessing the significance of a life sentence," *People v. Purvis*, 346 P2d 22, 30 (Cal. 1959), found that such a policy "has brought in its wake a trend of unremitting expansion in the scope of argument and evidence presented to the jury that has coincidentally produced and augurs future confusion." *People*

We adhere to our position, most recently affirmed in *Westbrook v. State*, 256 Ga. 776 (353 SE2d 504) (1987), that a defendant's parole eligibility is not, and ought not be, an issue considered by the jury in the sentencing phase of a death penalty case.

We hold as follows: The jury should not be encouraged to add stipulations, conditions, or recommendations of no parole to its verdict. Nor should the jury be instructed, implicitly or explicitly, that a defendant's release on parole is a matter governed solely by the illimitable discretion of the Board of Pardons and Paroles.

If, and only if, the jury asks to be instructed about the possibility of parole, the court should mention the issue only to the extent of telling the jury in no uncertain terms that such matters are not proper for the jury's consideration.[3]

The instructions given in this case not only failed to discourage jury consideration of the possibility of parole, they implicitly encouraged such consideration, and in a manner that emphasized the jury's inability to limit or eliminate the possibility of parole. The trial court erred by giving these instructions, and the death sentence imposed in this case must be vacated.

10. The conviction is affirmed. The death sentence is reversed. The case is remanded to the trial court for resentencing proceedings.

*Judgment affirmed in part, reversed in part. All the Justices concur, except Weltner, J., who dissents as to the reversal of the death sentence.*

WELTNER, Justice, dissenting.

I agree with all of the opinion except for that portion which vacates the death sentence and orders new proceedings. In view of the evidence in this case, I do not believe that this defendant has been harmed in any way by the observations made by the trial judge in response to the jury's question relative to parole.

DECIDED MARCH 12, 1987.

*Charles P. Rose, Jr.,* for appellant.
*Dupont K. Cheney, District Attorney, J. Thomas Durden, Jr., Assistant District Attorney, Michael J. Bowers, Attorney General,*

---

*v. Morse,* 388 P2d 33, 37 (Cal. 1964) (12 ALR3d 810, 816). The result, in many cases, was a "trial" on the issue of the parole agency's competency. Ibid.

[3] As an example, we set forth the following suggested instruction:

"You shall not consider the question of parole. Your deliberations must be limited to whether this defendant shall be sentenced to death or whether he shall be sentenced to life in prison. You should assume that your sentence, whichever it may be, will be carried out."

*Eddie Snelling, Jr., Assistant Attorney General,* for appellee.