Ronald Keith SPIVEY, Petitioner-Appellant,

v.

Frederick J. HEAD, Warden, Georgia Diagnostic and Classification Prison, Respondent-Appellee.

No. 98-8288.

United States Court of Appeals,

Eleventh Circuit.

March 28, 2000.

Appeal from the United States District Court for the Middle District of Georgia. (No. 95-00489-5-CV-1-HL), Hugh Lawson, Judge.

Before ANDERSON, Chief Judge, and CARNES and BARKETT, Circuit Judges.

ANDERSON, Chief Judge:

Ronald Keith Spivey, convicted of murder, kidnaping, armed robbery, and aggravated assault in the state courts of Georgia and sentenced to death, appeals the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons stated below, we affirm.

## I. FACTUAL & PROCEDURAL BACKGROUND

Ronald Spivey began the evening of December 27, 1976, by entering a bar in Macon, Georgia. Inside he got into an argument with Charles McCook over a twenty-dollar pool game bet. Spivey ended the dispute by firing his gun which wounded a bystander and killed McCook, from whose shirt pocket Spivey then took a twenty-dollar bill. Spivey went next to another Macon bar and robbed it at gunpoint.[1]

From there, he proceeded to Columbus, Georgia where he entered another bar, the Final Approach. While robbing the two waitresses and one customer inside, Spivey saw Billy Watson, an off-duty Columbus police officer working as a security guard at a nearby restaurant, and Buddy Allen, the restaurant's manager,

---

[1] In Bibb County, Spivey was tried and convicted of murder and armed robbery and sentenced to life imprisonment for the former and twenty years for the latter. The Supreme Court of Georgia affirmed the conviction in *Spivey v. State,* 244 Ga. 114, 259 S.E.2d 60 (1979). On state collateral review, however, the Superior Court of Butts County, Georgia granted Spivey a writ of habeas corpus in 1986, thus vacating the conviction, because it was based in part on the use of evidence gathered in a psychiatric examination of Spivey that was conducted in violation of his constitutional rights.

coming to investigate. At close range, Spivey shot and killed Watson. He also shot Allen two or three times. Spivey took the waitresses and customer hostage and proceeded to the parking lot, picking up Watson's gun and shooting Allen again along the way. Allen, still alive, got up and went to his restaurant to get help. Spivey shot several times into the restaurant wounding a bartender. He then took one of his hostages, Mary Jane Davidson, with him as he fled by car.[2] The next morning, police in Alabama arrested Spivey and freed Davidson.

In June of 1977, Spivey was tried for the activities taking place in Columbus and convicted of murder, kidnaping, armed robbery, and aggravated assault in Muscogee County Superior Court. The court, upon the recommendation of the jury, sentenced him to death. The Georgia Supreme Court affirmed the conviction in *Spivey v. State,* 241 Ga. 477, 246 S.E.2d 288 (1978). The United States Supreme Court denied certiorari. *See Spivey v. Georgia,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 699 (1978) (mem.). Spivey then pursued state collateral relief, but the Superior Court of Butts County denied his habeas corpus petition, the Georgia Supreme Court denied a certificate of probable cause to appeal, and the United States Supreme Court denied certiorari. *See Spivey v. Zant,* 444 U.S. 957, 100 S.Ct. 438, 62 L.Ed.2d 330 (1979) (mem.).

Spivey next petitioned the United States District Court for the Middle District of Georgia for a writ of habeas corpus. The district court denied the petition. Spivey appealed to the United States Court of Appeals for the Fifth Circuit. The Court of Appeals reversed and remanded for an evidentiary hearing on the circumstances of a psychiatric evaluation of Spivey conducted before his trial. *See Spivey v. Zant,* 661 F.2d 464 (5th Cir. Unit B Nov.1981), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982). The district court held an evidentiary hearing and again denied Spivey relief. The Court of Appeals vacated and remanded. *See Spivey v. Zant,* 683 F.2d 881 (5th Cir. Unit B. Aug.1982). On remand in September of 1982, the district court granted habeas corpus relief.

_____

[2]Although Spivey allegedly sexually assaulted Davidson, he was never charged with any sexual offense.

In November of 1983, Spivey was tried and convicted again in Muscogee County. Again the jury recommended the death penalty and the court sentenced Spivey to death. The Georgia Supreme Court affirmed, *see Spivey v. State,* 253 Ga. 187, 319 S.E.2d 420 (1984), and the United States Supreme Court denied certiorari, *see Spivey v. Georgia,* 469 U.S. 1132, 105 S.Ct. 816, 83 L.Ed.2d 809 (1985) (mem.).

Spivey then pursued the various avenues of collateral relief. In March of 1985, Spivey petitioned the Superior Court of Butts County for a writ of habeas corpus. The court held a hearing in October 1987 and denied relief in March 1989. The Supreme Court of Georgia denied a certificate of probable cause to appeal and the Supreme Court of the United States denied certiorari. *See Spivey v. Kemp,* 494 U.S. 1074, 110 S.Ct. 1797, 108 L.Ed.2d 798 (1990) (mem.). He next petitioned the United State District for the Middle District of Georgia for habeas relief. The district court in April 1993 stayed the habeas proceedings to allow Spivey to pursue a second state habeas petition regarding the State's withholding of evidence favorable to the defense. The state habeas court dismissed this second petition as successive in April 1995, the Supreme Court of Georgia denied Spivey a certificate of probable cause to appeal in June 1995, and the Supreme Court of the United States denied certiorari in January 1996. *See Spivey v. Thomas,* 516 U.S. 1077, 116 S.Ct. 784, 133 L.Ed.2d 734 (1996) (mem.). Although the district court dismissed the federal habeas petition without prejudice, Spivey filed a second habeas petition with the district court on November 17, 1995; the State does not contend that the petition is successive. On December 19, 1997, the district court denied the petition. From this order, Spivey now appeals.

On appeal, he enumerates twenty claims.[3]  Among them, Spivey argues that 1) he was deprived of a fair trial because of pretrial publicity and the failure to change venue, 2) he was deprived of a fair trial by excessive security measures during the trial, 3) he was denied his right to a fair and impartial jury by the trial judge's restrictions on voir dire, refusal to excuse prospective jurors for bias, and excusal of prospective jurors who objected to the death penalty, 4) he was denied a fundamentally fair trial by the prosecutor's improper arguments to the jury, 5) his prior vacated conviction was relied on in sentencing thus violating his Eighth Amendment rights under *Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), and 6) the state unconstitutionally withheld exculpatory material in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

## II. STANDARD OF REVIEW

When reviewing a habeas petition from someone convicted in state court, federal courts can only grant the writ on the ground of a violation of the Constitution or federal law.  *See* 28 U.S.C. 2254(a). Furthermore, we will not review state court decisions on federal claims that rest on state law grounds, including procedural default grounds, that are independent and adequate to support the judgment.  *See Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).  Factual determinations made by the state court are presumed to be correct unless rebutted in one of eight possible ways, including

---

[3]Spivey enumerated twenty-four claims before the district court, but on appeal does not argue Claims XIX (arguing that underrepresentation of distinct groups, in particular blacks, women, and persons between 18 and 30 years of age, on his grand and traverse juries violated his Sixth and Fourteenth Amendment rights), XX (challenging the trial court's denial of his request for funds to obtain sociological and statistical experts to assist in establishing his challenges to the jury pools), XXI (arguing that the exclusion at trial of some mental illness evidence, in particular portions of medical records which were relied on by Spivey's psychiatric expert, violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights), and XXIV (arguing that the cumulative effect of all constitutional errors rendered the trial fundamentally unfair) and thus we find these four claims abandoned.  Nonetheless, we use the claim numbers utilized by the district court below and in the parties' briefs.

4

a showing that the factual determination is not fairly supported by the record. *See* 28 U.S.C. 2254(d) (1995) (amended 1996).[4]

## III. LEGAL ANALYSIS

A.      *Claim I & II: Pretrial Publicity And Change Of Venue*

Spivey argues that, given the amount of prejudicial pretrial publicity, the trial judge's refusal to change the venue deprived the appellant of his constitutional right to a trial by a fair and impartial jury. Spivey further argues that the reporting of the prosecutor's comments criticizing the death penalty jurisprudence of the U.S. Court of Appeals for the 11th Circuit exacerbated the problem of pretrial publicity.[5]

To establish that pretrial publicity prejudiced Spivey without an actual showing of prejudice in the jury box, he must show first that the pretrial publicity was sufficiently prejudicial and inflammatory and second that the prejudicial pretrial publicity saturated the community where the trial was being held. *See Coleman v. Kemp,* 778 F.2d 1487, 1490 (11th Cir.1985); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). In *Coleman,* we emphasized that the "presumptive prejudice standard recognized in *Rideau* is only rarely applicable ... and is reserved for an extreme situation." 778 F.2d at 1537 (citations

---

[4]Spivey filed his petition for writ of habeas corpus on November 17, 1995, before the effective date (April 24, 1996) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and therefore the AEDPA standard of review provisions, codified at 28 U.S.C. § 2254(d), (e), are not applicable. *See Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (holding AEDPA standard of review provisions inapplicable in a noncapital case pending when AEDPA was enacted); *Mills v. Singletary,* 161 F.3d 1273, 1280 n. 6 (11th Cir.1998) (holding same in a capital case). In addition, the AEDPA's special habeas corpus procedures for capital cases, codified at 28 U.S.C. §§ 2261-66, do not apply because they require a state to "opt in" to them by meeting certain requirements, *see Neelley v. Nagle,* 138 F.3d 917, 921-22 (11th Cir.1998), *cert. denied,* 525 U.S. 1075, 119 S.Ct. 811, 142 L.Ed.2d 671 (1999) (mem.), and the state here has not asserted that it opted in by meeting these requirements.

[5]In Claim II, Spivey contends that the prosecutor's comments inflamed the community against him and constitute misconduct warranting habeas relief. To the extent Spivey's Claim II is a substantive claim based on prosecutorial misconduct independent of Claim I's venue change and prejudicial pretrial publicity grounds, we agree with the district court and find it procedurally defaulted for failure to raise in the trial court and on direct appeal. Nonetheless, in evaluating Claim I and whether the pretrial publicity was prejudicial, we consider all the relevant pretrial publicity including any reports of the prosecutor's comments.

and quotation marks omitted). Furthermore, Spivey's burden "to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one." *Id.*

We have carefully reviewed the record and conclude that Spivey has not satisfied this burden. The publicity cited is a number of newspaper articles. Most of these are factual accounts of the criminal events and are neither sufficiently prejudicial nor inflammatory to make the necessary showing. Many of these accounts were published years before the trial. Other articles, including the one containing the prosecutor's comments, direct criticism at how the federal courts have handled death penalty cases and only obliquely mention Spivey's case and, therefore, are not sufficiently, if at all, prejudicial or inflammatory. Although some articles had prejudicial elements, for instance the mention in the November 14, 1983 Columbus Enquirer of a letter to the editor Spivey once wrote confessing his guilt, Spivey has not shown that such articles were typical or widespread. *Cf. Rideau,* 373 U.S. at 726, 83 S.Ct. 1417 (finding a denial of due process where trial court refused the request for a change of venue after the community was exposed "repeatedly and in depth" to a television broadcast of an interview of defendant confessing in detail). Thus, Spivey fails to establish that the pretrial publicity was sufficiently prejudicial or inflammatory constitutionally to require a change of venue.

Furthermore, Spivey fails to show that the pretrial publicity saturated the community where the trial was being held. In contrast to *Coleman* where the trial court had to strike almost one-half of the prospective jurors who were questioned whether they had formed an opinion because they had a fixed opinion, *see* 778 F.2d at 1543, here many of the prospective jurors had not heard anything about the case and most remembered very little, if anything, about it. *See Spivey,* 319 S.E.2d at 432. In fact, only six of the seventy prospective jurors were struck because of their exposure to pretrial publicity. *See id.* We agree with the Georgia Supreme Court that "[t]he low percentage of venire men excused for prejudice resulting from pretrial publicity is strong evidence of the absence of prejudicial community bias." *Id.* We affirm the district court with respect to Claims I & II.

6

B.        *Claim III:  Security Measures In The Courtroom*

Spivey argues in Claim III that the trial court abdicated responsibility for courtroom security to the sheriff and that excessive security measures unduly prejudiced Spivey thereby depriving him of his constitutional right to a fair trial.  The record neither reflects that the trial court abdicated its responsibility nor that the measures were unduly prejudicial.

The trial court relied on the sheriff's expertise and assistance in matters of courtroom security, but did not abdicate control.  Early in the trial, the court made clear that it was "aware of the fact that the sheriff's office does provide adequate security and will provide adequate security" and was going to rely on this expertise.  Tr. Trans. 211-12.  The court decided at which table each party must sit in light of the security of both the courtroom and the defendant after considering the advice of the sheriff.  *See* Tr. Trans. 4-11.  When the defense counsel objected to the number of guards, the court responded:

> Because of your concerns [about the safety of the defendant], *I have ordered* these people to be here so that we can—there can be no question that he is safe....

> But based on your concern and Mr. Spivey's concerns about Columbus, that is why the security is—and I think I would not be doing *my duty* if I did not see that there was ample security.

Tr. Trans. 21-22 (emphasis added).  Although the court later said, "I have given responsibility of securing this courtroom to the sheriff's office ... I'm not going to tell them how to carry on their security" and "I've given that responsibility [for security] to the sheriff's office and it is their duty to do whatever they feel is necessary to make it safe," in the context of the proceeding these remarks only indicate that the court, while maintaining ultimate responsibility for the trial's fairness, security, and decorum, was letting the sheriff's office make the tactical decisions regarding deployment of the guards, which was necessarily overseen by the trial court judge.  If the sheriff's office or the guards acted in a manner inconsistent with the trial court's ultimate responsibilities, the court had the authority to order different security measures.  Unlike an abdication, the delegation here was partial and revocable.  In addition, when the trial court overruled Spivey's motion for a mistrial based on the security measures taken by the sheriff and the guards, it implicitly approved

7

of the measures. *Cf. Allen v. Montgomery,* 728 F.2d 1409, 1412 n. 3 (11th Cir.1984) (finding no constitutional error in permitting the sheriff to decide what security measures were necessary to transport defendant safely to trial where the sheriff shackled him and trial judge implicitly at least indicated he would have ordered similar security precautions by denying a motion for mistrial in which he found that the precautions were reasonable).

The failure of Spivey's abdication argument is not dispositive of Claim III, for a constitutional violation takes place, regardless of who is ultimately responsible for the measures, if the security measures were so inherently prejudicial that they denied him a fair trial. In *Holbrook v. Flynn,* 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), the Supreme Court denied a habeas petitioner's claim that conspicuous uniformed armed guards present at trial unduly prejudiced the jury. The Court first rejected the idea that the deployment of security personnel should, like the inherently prejudicial practice of shackling, be closely scrutinized and instead held that "a case-by-case approach is more appropriate." 475 U.S. at 568-69, 106 S.Ct. 1340. The Court articulated the standard:

> All a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.

475 U.S. at 572, 106 S.Ct. 1340.

Spivey asserts that uniformed guards, usually eight, surrounded him, moved when he moved running behind him and leaping from the corners, treated him like a wild dog, interfered with his ability to

communicate freely with counsel, and cut off his attorney from his defense consultants.[6] The guards' actions, Spivey argues, gave the jurors the impression that he was a dangerous man.[7]

We first ascertain the scene presented to the jurors. *See id.* Spivey was not shackled. He was permitted to stand to ask questions during voir dire. There were at times eight uniformed guards in the courtroom, though at other times fewer. The guards did not form a semicircle around Spivey. *See* Tr. Trans. 22 ("[T]hey're not forming a semicircle around him."); *Spivey,* 319 S.E.2d at 436 ("The record shows the officers did not form a semicircle around Spivey."). We find that this scene was not so inherently prejudicial as to pose an unacceptable threat to the right to a fair trial. The threat to the right to a fair trial posed by the presence of these uniformed guards was both slight and acceptable, especially in light of the threats to the defendant's life and the bullet fired through his jail window. *Cf. Zygadlo v. Wainwright,* 720 F.2d 1221 (11th Cir.1983) (denying habeas relief where state trial court ordered the shackling of the defendant's legs, in light of fact that defendant had made previous escape attempt while awaiting appearance before court). Accordingly, we affirm the district court with respect to Claim III.

C.        *Claims IV, V, VI, & VII:  Right To A Fair And Impartial Jury*

---

[6]These last two complaints are more properly grounded in the right to counsel rather than the right to fair trial. Regardless, the record provides no factual basis for the Spivey's claims that the security measures impermissibly interfered with his ability to communicate with his attorney and cut the attorney off from the defense's jury consultants. In fact, the record indicates that Spivey's attorney was able to confer adequately with these consultants, including on at least one occasion in a private room provided by the court during the jury selection process. *See* Tr. Trans. 393, 415-16.

[7]The potentially most prejudicial incident is when one guard allegedly shoved the standing Spivey back down into his chair during the voir dire of potential juror Allena McCann. *See* Tr. Tran. 765-67. However, the guard testified that he did not physically push Spivey and McCann was never empaneled, *see* Tr. Trans. 1248.23, so Spivey was not denied a fair and impartial juror by her observing whatever transpired here. *Cf. Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) (holding that claims that jury was not impartial must focus on the jury that actually sat).

9

In Claim V and VI, Spivey argues his right to a jury of impartial jurors under the Sixth and Fourteenth Amendments was violated when the trial court refused to excuse prospective jurors for cause.[8] Spivey maintains that prospective jurors Linda Day, Waltroud Moseley, Celestrial Lyons, Justine McMichael, John Meachum, Sidney Broom, Edward Burrus, Dorothy Penny, Mark Lynes, and Ruby Huckaby demonstrated bias and that prospective jurors Ollie Tellis, Kenneth Morgan, Edward Burrus, Betty Brown, and Ruby Huckaby were biased in favor of the death penalty and therefore the trial court should have excused them all.

The state habeas court found that Spivey did not preserve for later review the issue of the trial court's refusal to excuse Penny, Huckaby, Tellis, Morgan, and Brown because he did not raise it on direct appeal. Resp. Ex. 4(W) p. 33, 47. Having carefully reviewed the record, we agree and find his claim with respect to these prospective jurors procedurally defaulted.

The right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *see Ross v. Oklahoma,* 487 U.S. 81, 85, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) ("It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury."). Claims that the jury was not impartial must focus on the jurors who actually sat. *See Ross,* 487 U.S. at 86, 108 S.Ct. 2273; *Heath v. Jones,* 941 F.2d 1126, 1133 (11th Cir.1991) (holding that habeas petitioner can only raise the trial court's denials of challenges for cause of those venire members who eventually sit on the jury). None

---

[8]In Claim IV, Spivey argues that the trial court unfairly restricted voir dire. Although the trial court did not permit some of defense counsel's questions, such as "In what type of cases do you think the death penalty would be appropriate?" "When you first heard that this was a death penalty case, what went through your mind?"and "On what do you base your belief in the death penalty?" Tr. Trans. 347, 350, 360-362, it did allow many others including "Do you feel the death penalty should be limited to certain types of crimes?" "In your opinion in any case should revenge or vengeance play in your decision whether or not to impose the death penalty?" "How do you feel about the death penalty as a criminal punishment?" and "What is the basis of your conscientious decision to favor the death penalty?" Tr. Trans. 347, 350, 356-57, 362. Given the breadth of the questions permitted defense counsel as well as the trial court's own questions, we find the voir dire constitutionally adequate to test the prospective jurors for bias or partiality and therefore affirm the district court with respect to Claim IV.

of the prospective jurors, however, that Spivey complains of-save Penny, who is procedurally defaulted-were part of the jury that actually sat in this case. The defendant used his peremptory challenges to strike Day, Moseley, Lyons, McMichael, Meachum, Broom, and Lynes as jurors and Burrus and Huckaby as alternate jurors. *See* Tr. Trans. 1248.16-1248.28.

The appellant complains[9] that he was forced to use his peremptory challenges to remove prospective jurors whom he alleges should have been removed for cause. He argues that because he had to reserve his last peremptory challenge for Burrus, Doris Estell, whom he would have otherwise peremptorily challenged, ended up on the jury. In *Ross,* the Supreme Court "reject[ed] the notion that the loss of peremptory challenges constitutes a violation of the constitutional right to an impartial jury." *Ross,* 487 U.S. at 88. The Court elaborated: "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Ross,* 487 U.S. at 88; *see also United States v. Farmer,* 923 F.2d 1557, 1566 (11th Cir.1991) (rejecting appellant's argument that trial court's refusal to excuse jurors for cause and the resultant use by the defendant of his peremptory challenges to remove these jurors required reversal). The fact that Estell sat on the jury did not produce an impartial jury or a constitutional error. Spivey never challenged Estell for cause in the trial court and now only asserts that she is an undesirable juror, not a juror who should have been excused for cause.[10] *See* Tr. Trans. 1097-1103 and Appellant's brief 10-29-98 at 17, n. 7. Spivey fails to establish that his constitutional right to an impartial jury was violated by the trial court's refusal to excuse these jurors for cause.

In Claim VII, Spivey relies on *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), to argue that the trial court

---

[9]Appellant's argument is vague; he points to no constitutional violation and articulates no theory other than a general suggestion of unfairness. Appellant does not even cite *Ross.*

[10]Although Spivey on his direct appeal to the state supreme court claimed Estell should have been struck for cause, he did not repeat this claim to the district court below or make it to this Court.

11

violated his constitutional rights by excusing for cause those jurors whose views opposed the death but who said they could follow the law. Prospective jurors Waltina Hughley and Denise Hale, Spivey asserts, at first stated their conscientious objections to the death penalty but then said they were willing to consider it.

In *Witherspoon,* the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding venire men for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522, 88 S.Ct. 1770. Attempting to alleviate confusion in the lower courts and to refine the standard, in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court revisited the issue of what degree of deference a federal court in a habeas corpus proceeding should pay a state court's excusal of prospective jurors for their views opposing capital punishment. It held that the standard is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Witt,* 469 U.S. at 424, 105 S.Ct. 844 (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). The Court added that this standard does not require that the "juror's bias be proved with 'unmistakable clarity.' " *Id.* Noting that assessments of demeanor and credibility are "peculiarly within a trial judge's province," the Court decided that the trial court's determination on this issue is a factual finding deserving deference on habeas review. *Witt,* 469 U.S. at 428-29, 105 S.Ct. 844.

Applying this standard, the trial court did not constitutionally err in excusing Hughley and Hale. Although Hughley at some points said she thought she could do her duty as a juror and consider the death penalty, her testimony viewed in its entirety supports the trial court's excusal.[11] Hughley stated:

---

[11]On voir dire, the following exchange took place between Hughley and the prosecutor:

> Q: Are your feelings about the death penalty ... so strong that no matter what the facts or circumstances of the case might be ... you could never vote to impose the death penalty?
>
> A: That's right.

Well, even if I did know about the case to [be] fair about it and still she [the trial judge] said we had to, you know, say death penalty, I don't think I could vote for it. I don't, I really don't think I could vote for it.

. . . . .

[I could] [n]ever give the death penalty. I'm being fair. I'm telling the truth.

Tr. Tran. 723. This testimony sufficiently demonstrates that Hughley's views would prevent or substantially impair her ability to impose the death penalty. Likewise, Hale's testimony, though at times contradictory, sufficiently demonstrates that her views would prevent or substantially impair her ability to impose the death sentence. She indicates she could not fully and fairly consider the death penalty and that she can imagine no type of case where she could consider voting to impose the death penalty. *See* Tr. Trans. 1177, 1182. The assessments of jurors' states of mind are "based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province" and are therefore entitled to deference on habeas review. *Witt,* 469 U.S. at 428, 105 S.Ct. 844. The testimony of these jurors satisfied the trial court that they should be struck for cause. Having reviewed the voir dire testimony of these prospective jurors in its entirety and applying the standard articulated in *Witt,* we find no constitutional error in the trial court's excusal of Hughley and Hale.[12] We affirm the district court with respect to Claims IV, V, VI, & VII.

D.      *Claims VIII, IX, X:  Propriety Of The Prosecutor's Arguments*

In Claims VIII, IX, and X, Spivey argues that the prosecutor made improper arguments in his closing arguments at both the guilt-innocence determination phase and the sentencing phase. These improper arguments, Spivey claims, denied him of a fundamentally fair trial and warrant reversal.

---

Q: You could never even consider giving the death penalty, is that right?

A: That is right.

Tr. Tran.719

[12]Although the district court below also found no violation with respect to the excusal of prospective jurors Albert Moore and Annette White because of their conscientious objection to the death penalty, we do not address these jurors because Spivey does not argue on appeal that their excusal was improper.

13

Improper prosecutorial arguments, especially misstatements of law, must be considered carefully because "while wrapped in the cloak of state authority [they] have a heightened impact on the jury." *Drake v. Kemp,* 762 F.2d 1449, 1459 (11th Cir.1985). When assessing this type of claim, this Court examines the entire context of the judicial proceeding to determine if it was fundamentally unfair. *See Brooks v. Kemp,* 762 F.2d 1383, 1400 (11th Cir.1985) (en banc), *vacated,* 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), *reinstated,* 809 F.2d 700 (1987). Not every improper prosecutorial remark, therefore, renders the trial unfair. *See id.* Improper arguments do, however, render the capital sentencing hearing fundamentally unfair and require reversal when there is a reasonable probability that they changed the outcome of the case. *See id.* at 1402. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.* at 1401 (quoting *Strickland v. Washington,* 466 U.S. 668, 669, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Proper arguments, regardless of their impact on the outcome of the case, do not render a trial unfair. Therefore, first we examine the state's arguments here to identify those that were improper in light of Georgia's capital sentencing regime. Then we determine if these improper arguments in a reasonable probability changed the outcome of the case.

In Claim VIII, Spivey argues that the prosecutor improperly argued that the community wanted a death sentence and would hold the jury accountable for their verdict. In his closing argument at the sentencing phase, the prosecutor argued:

> Your verdict will say one of two things and everyone will know it. There has been a lot of interest in this trial. You have been isolated from news media coverage and properly so because you are to pass on, and I don't know what someone's interpretation is of the events which have occurred here, but you are to pass on what you perceive the evidence to be in [sic] the charge you hear from the court. But there has been a lot of interest attracted to this case. And I reminded you yesterday if you recall that it is your verdict, speaks not for just the twelve of you individually and collectively which is certainly done but it is your verdict that speaks for the entire system, the entire population, all 173,000 of us, I believe, in Muscogee County. And not one of you chose to be here. I am confident of that....

> But by the system of justice that we operate under and by the lack of a better term, the lot we draw, 12 of you 14 will make this decision which is critically important obviously to the defendant, literally it is his life that is at stake, but also critically important to each and every one of the citizens of Muscogee County whose eyes are focused on us at this time.

14

Tr. Trans. 2460-61. Spivey maintains that the prosecutor argued that the jury should sentence the defendant to death not on the evidence in accordance with the appropriate legal standards, but because it was what the community wanted and expected. Although such an argument would be improper, we interpret the prosecutor's closing here differently and find it proper, though somewhat ambiguously phrased.[13] *See Brooks,* 762 F.2d at 1400 ("[I]solated or ambiguous or unintentional remarks must be viewed with lenity."). Rather than urging the jury to return a death sentence because the community demands it, the prosecutor emphasized that the jury must decide based on the evidence they perceived and on the charge the court will give.

The references to the community indicate the obvious: the jury at the sentencing phase is asked to decide "what justice demands that society perform in response [to the crime]." *Collins v. Francis,* 728 F.2d 1322, 1341 (11th Cir.1984). A jury's consideration of the appropriateness of retribution is proper. *See Brooks,* 762 F.2d at 1407. In this case, the prosecutor essentially argued that Spivey should be sentenced to death because that is the punishment he owes to society. In other words, the jurors acting as the representatives of the county must decide if the death penalty is the appropriate punitive action. Clarifying this point, the prosecutor continued:

> And your verdict is going to say one of two things, one of two things. It's going to say that in Muscogee County, Georgia, and in Columbus if you violate the law, if you take human life with malice of aforethought, if it's done under aggravating circumstances you are going, and you are given a trial, a fair trial and you are convicted, found guilty beyond a reasonable doubt you are going to be punished and you are going to be punished appropriately. And I submit to you that is what a verdict of, "We, the jury, recommend the death penalty" will say. Or your verdict will say in Muscogee County, given those circumstances if you take human life with malice of aforethought, if you do it under aggravating circumstances such as in an armed robbery you are going to get literally a slap on the wrist.

---

[13]Defense counsel did not object at trial on this "community expectations" basis which suggests that he too at the time interpreted the statement as we do and not as Spivey now asserts it should be interpreted. *See Brooks,* 762 F.2d at 1397 n. 19 ("Although counsel's failure to object to the argument does not bar our review of the claim in this case, the lack of an objection is a factor to be considered in examining the impact of a prosecutor's argument."). Only on appeal did Spivey raise this issue. *See Spivey,* 319 S.E.2d at 427. The State does not assert a procedural bar in this regard.

Tr. Trans. 2461-62. In light of the jury's representative and policy role and its discretion in determining whether or not to recommend the death sentence, the prosecutor may argue what policy statement each verdict will make for Muscogee County.[14] Thus, Claim VIII fails because the prosecutor's argument is not improper.

Of course, it is improper for a prosecutor to mislead or misrepresent the law to the jury, including the meaning of a verdict. In Claim X, Spivey contends that the prosecutor did just that by misleading the jury on the meaning of Spivey's prior life sentence and the effect of a second life sentence. Explaining why a life sentence verdict would be just "a slap on the wrist," the prosecutor in his closing during the sentencing phase continued:

> State's Exhibit Number 22 ... is an Indictment, a verdict of guilty, and a sentence to life imprisonment for the defendant in Bibb County, Georgia. You know when he committed that murder in Bibb County, Georgia? Two hours before he committed the one, or three hours before he committed the one in Muscogee County. So your verdict of life imprisonment will not add one day of punishment to this man.... If he is sentenced to life imprisonment on the first murder and you give him life on the second, is that appropriate punishment?

Tr. Trans. 2462-63. Spivey claims that the second life sentence would have extended the time before which he was eligible for parole under Ga.Code Ann. § 42-9-39(b) and therefore would have been additional punishment. The state responds that at the time of Spivey's sentencing Georgia law barred the jury from considering parole eligibility in sentencing. *See Quick v. State,* 256 Ga. 780, 353 S.E.2d 497, 503 (1987). In *Quick,* the Georgia Supreme Court recommended, upon an inquiry into parole eligibility by the jury, that the trial court should instruct the jurors to assume that their sentence, death or life imprisonment, will be carried out. *See id.* at 503 n. 3. Although a second life sentence would have affected parole eligibility, the sentence imposed would have been the same: life imprisonment.

---

[14]In *Collins,* 728 F.2d at 1340-41, we explained the important policy and representative role that the jury plays:

> Under the sentencing model employed by Georgia in capital cases the jury is given the task, subject to full Georgia Supreme Court review, of fashioning state sentencing policy. In discharging this task, the jury functions as a fact finder in determining the presence of aggravating and mitigating circumstances, but [also] acts as a policy maker in determining whether a sentence of death or life imprisonment should be imposed.

Assuming *arguendo* that the prosecutor did misstate the law and his argument was therefore improper, we conclude that there is not a reasonable probability that the misstatement changed the outcome of the case. At the sentencing stage, the jury faced the central question of whether to sentence Spivey to death or to life imprisonment. Parole was not a meaningful factor in their decision as the focus of defense counsel's argument implicitly demonstrated:

> Ron Spivey should not ever, ever, ever be released from jail. I submit to you that when the last breath passes out of his body, he will be behind bars, ladies and gentlemen; and that's where he should be, and we have never asked you to compromise that fact one iota. Ron Spivey is under a life sentence from Macon. He's under a 20-year sentence from Macon. You returned a verdict last night, and whether it had been guilty or guilty but mentally ill, he would be under life sentences and 20 years and ten.... The Judge will impose those sentences on Ron Spivey. This man will never be out of jail, and the Judge will instruct you that life imprisonment in this case means to remain in jail for the remainder of his life. And I wouldn't ask you for one day less.

Tr. Trans. at 2488. Furthermore, he emphasized that "Ron Spivey will never ever, ever be anyplace other than the state penitentiary.... He's never going to be released" and that "We're not asking that Ron Spivey be released. We are asked that he be kept in prison the rest of his life." Tr. Trans. 2494. The slap on the wrist phrasing is hyperbola which is unlikely to have affected even minimally a jury facing a question with the gravity of the one put before it here. In light of the totality of the circumstances, the prosecutor's argument

17

about the meaning of the sentence does not undermine confidence in the outcome.[15] Thus, the sentencing trial was not fundamentally unfair.

In Claim IX, Spivey argues that the prosecutor also misled the jury about the meaning and consequence of a verdict of guilty but mentally ill. During the prosecutor's closing argument, the following transpired:

[Prosecutor]:    And let me make the position of the State of Georgia, whom I represent, clear in this case from this moment forward. And that is this. The verdict of guilty but mentally ill is the same as a not guilty verdict. On behalf of these victims—.

[Defense    Counsel]: [objecting] Your Honor, that's a misstatement of the law and it misleads the jury. And I never interrupt during a closing argument, but, Your Honor, that is a misstatement of the law.

The    Court:  The Court will give the law.

. . . .

[Prosecutor]:    In the eyes of these victims, members of the jury, I submit they are synonymous, one and the same. Of course, they're separate verdicts. Of course they are. You're going to be given four potential verdicts. And I submit to you, in the eyes of the prosecution and the eyes of the victims, they're one and the same.

---

[15]Spivey also complains that this argument renders the trial fundamentally unfair because, as it turns out, the prior murder conviction in Bibb County was set aside because it relied on evidence acquired in violation of Spivey's constitutional rights. We disagree. We do not believe the result here would have been different if instead of arguing as he did, the prosecutor had made an argument along the following lines: Spivey has already been convicted and sentenced to life imprisonment; true, Spivey might argue that collateral appeals of the Bibb County conviction are available and might set aside that conviction and order a new trial; but, even if that should happen, Spivey would likely be reconvicted and sentenced again to life imprisonment as he has testified to this jury that even he believes he is "100-percent guilty of everything they say I have done" in Bibb County, Tr. Trans. 1726, and he has admitted an egregious criminal history. In other words, if the prosecutor had given the jury a completely accurate and precise account of the status of Spivey's prior Bibb County conviction and sentence, we are satisfied that the jury's decision would have been the same. In fact, when cross-examining Spivey, the prosecutor essentially provided an account of the conviction's status by asking if Spivey was "aware that the same witnesses testified in that [prior Bibb County] case that testified in the first trial here [in Muscogee County] and [the prior Bibb County conviction is] subject to being overturned for the very same reasons [for which the prior Muscogee County conviction was overturned]?" Tr. Trans. 1804. Moreover, in light of all the evidence, Spivey's egregious criminal history, and the fact that the only real defense theory to avoid the death sentence was mental health evidence, which the jury obviously rejected, we doubt in any event that the jury imposed the death sentence because of the technical fact that he already had a prior life sentence.

Tr. Trans. 2268-69.

Taken literally, the prosecutor's remarks in this exchange incorrectly state that a verdict of guilty but mentally ill is equivalent to a not guilty verdict and imply that returning a guilty but mentally ill verdict will result in the same sentencing as a not guilty verdict, i.e., no sentence. In fact, Georgia law at the time provided that "[w]henever a defendant is found guilty but mentally ill at the time of a felony, or enters a plea to that effect that is accepted by the court, the court shall sentence him in the same manner as a defendant found guilty of the offense." 1982 Ga. Laws 1476, 1481 (codified at Ga.Code Ann. § 17-7-131).[16] The misstatement during this exchange is exacerbated somewhat because it is prefaced by the prosecutor's deliberate waving of the "cloak of state authority." *Drake,* 762 F.2d at 1459. However, we find that this literal interpretation-i.e., that a verdict of guilty but mentally ill is no different from a not guilty verdict-is so outrageously incredible and contrary to common sense that it could not be the way the jury interpreted the prosecutor's statements.

---

[16]The trial court responded to the defense counsel's objection with the promise "The Court will give the law." Ordinarily the "giving of curative instructions by the trial court may remedy effects of improper comments." *Brooks,* 762 F.2d at 1400. Yet here, although the court did instruct the jury on the legal definitions of insanity and mental illness, the court never clarified that a defendant found guilty but mentally ill is sentenced in the same manner as a defendant found guilty. The court's omission, however, is understandable because under Georgia law, Spivey was not entitled to jury instructions regarding the consequences and sentencing options associated with a guilty but mentally ill verdict. *See Cranford v. State,* 186 Ga.App. 862, 369 S.E.2d 50, 51 (1988) ("[Defendant] was not entitled to an instruction on sentencing options of that verdict [of guilty but mentally ill], as that would have no bearing on his guilt or innocence."); *cf. Cooper v. State,* 253 Ga. 736, 325 S.E.2d 137 (1985) (holding that there was no need to charge on consequences of a verdict of not guilty by reason of insanity "because the provisions of the law dealing with the disposition of the case after the finding of not guilty by reason of insanity have no bearing upon the guilt or innocence of the defendant"). Interestingly, after the trial the Georgia legislature amended § 17-7-131 of the code in 1985 to require the following jury instruction when the defense of insanity is interposed to clarify the consequences of a verdict of guilty but mentally ill:

> I charge you that should you find the defendant guilty but mentally ill at the time of the crime, the defendant will be given over to the Department of Offender Rehabilitation or the Department of Human Resources, as the mental condition of the defendant may warrant.

1985 Ga. Laws 637, 639.

Instead, we conclude that the jury's probable interpretation of the prosecutor's remarks and argument is: a verdict of guilty should be returned because if the jury returns a verdict of guilty but mentally ill, then the death penalty is no longer a sentencing option and Spivey will only receive life imprisonment. This interpretation is consistent with the defense's own position. Spivey's admitted strategy was to concede the facts alleged by the state, but argue that, due to an emotional disturbance as explained by the testimony of two expert witnesses, the jury should find him guilty but mentally ill and impose a life sentence. Nowhere during the trial did Spivey argue that he should receive anything less than a life sentence, and thus he effectively conceded that a verdict of guilty but mentally ill would result in a life sentence, at least. In his closing argument, the prosecutor added, "What the defense is asking you to do is to find him guilty but mentally ill and send him to a hospital because he's sick, instead of where he belongs and where the second phase of this trial will concern itself with." Tr. Trans. 2285. The second phase, needless to say, was to concern itself with the central issue: should society execute Spivey or put him in prison for life. In other words, is death row when Spivey belongs? Within the context of the trial and the closing arguments of both sides, the jury probably interpreted the prosecutor's remarks to mean that if the verdict is guilty but mentally ill, then Spivey is no longer eligible for the death penalty.

The question still remains of whether the prosecutor's remarks so interpreted-that a guilty but mentally ill verdict precludes the death penalty-are incorrect or misleading. Complicating the issue, the Georgia Supreme Court has not answered this question. The language of the statute, that a defendant found guilty but mentally ill is sentenced "in the same manner as a defendant found guilty," indicates that the guilty but mentally ill defendant, the same as a guilty defendant, can be sentenced to death. 1982 Ga. Laws. 1476, 1485 (codified at Ga.Code. Ann. § 17-7-131(g)). Yet, in *Spraggins v. State,* 258 Ga. 32, 364 S.E.2d 861 (1988), the Supreme Court of Georgia, while leaving open the question of whether a defendant found guilty but mentally ill for a capital crime can be executed, commented:

> We have not yet resolved the question of whether a defendant found to be guilty but mentally ill is eligible for a death sentence, in light of the statutory provisions concerning such a verdict, but we

20

> need not do so today, for in any event, *we are not prepared to hold that the legislature of this state has created a meaningless verdict, or that the difference between a verdict of guilty and a verdict of guilty but mentally ill is inconsequential.*

*Id.* at 863 n. 2 (emphasis added). This comment, albeit dicta, signals that there must be a meaningful, consequential difference between the guilty verdict and the guilty but mentally ill verdict. The court suggests implicitly that this difference might be that the former permits the death penalty while the latter precludes it.

In response to the *Spraggins* decision, the Georgia legislature amended the code in 1988 putting it in its present form. *See* 1988 Ga. Laws 1003-1010. The amendment added a guilty but mentally retarded verdict to the verdict of guilty but mentally ill and provided that both guilty but mentally ill and guilty but mentally retarded defendants are sentenced the same as those found guilty of the offense except that those found guilty but mentally retarded are not eligible for the death penalty. *See* Ga.Code Ann. § 17-7-131(b), (g), (j); *see generally* Anne S. Emanuel, *Guilty But Mentally Ill and the Death Penalty: An Eighth Amendment Analysis,* 68 N.C. L.Rev. 37, 67 (1989) (arguing that the amendment is an indication that the legislature intended to allow the death penalty for guilty but mentally ill defendants). This legislative action could be interpreted as a clarification of the legislature's original intent for the guilty but mentally ill verdict, i.e., that those receiving this verdict, unlike mentally retarded individuals, can be executed. On the other hand, the 1988 amendment could be a change in the law and irrelevant to the state of the law in 1983 when this case was tried.

We need not resolve this issue of Georgia law because Spivey's claim fails whether or not a defendant found guilty but mentally ill could have been executed under Georgia law as it existed at the relevant time, i.e. in 1983. First, if Georgia law precluded the death penalty for a defendant found guilty but mentally ill, then the prosecutor's remarks correctly stated the law. Upon consideration of these remarks, the jury could have rejected the guilty but mentally ill verdict to preserve its option to recommend the death penalty. Having preserved this option and considered the evidence at the sentencing phase, the jury ultimately exercised the option and recommended the death penalty. On the other hand, if Georgia law permitted the death penalty

21

for a defendant found guilty but mentally ill, then the prosecutor's argument was a misstatement of the law.

However, Spivey has suffered no harm despite the prosecutor's misstatement of the law. The jury may have relied upon the prosecutor's misstatement and rejected the guilty but mentally ill verdict to preserve its sentencing options, but ultimately at the sentencing phase the jury recommended the death penalty on the same evidence as would have been presented had the jury returned a verdict of guilty but mentally ill. In other words, if the jury accepted the prosecution's argument and rejected the guilty but mentally ill verdict because it thought Spivey should receive the death penalty, then that is powerful evidence that the jury was not in any event going to return a life sentence. With or without the prosecutor's remarks on the guilty but mentally ill verdict, the reasonable probability is that the outcome was going to be the same, namely the death penalty. We conclude that Spivey's trial was fundamentally fair, despite the possibility that the prosecutor misstated the law.[17] Accordingly, we affirm the district court with respect to Claim IX.

E.     *Claim XI: Johnson v. Mississippi Claim*

Spivey argues in Claim XI that his death sentence is fundamentally unfair and violates due process and the Eighth Amendment because it is based on his unconstitutionally obtained prior conviction and life sentence in Bibb County.[18] In *Johnson v. Mississippi,* 486 U.S. 578, 581, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), a state court had sentenced defendant Johnson to death citing his previous New York felony conviction as one of three aggravating factors supporting the sentence. The prosecution introduced no evidence about the conduct underlying the prior conviction, but relied instead on a single authenticated copy

---

[17]If Spivey had been found guilty but mentally ill, instead of guilty, Georgia law would have provided that "he shall be further evaluated and then treated, within the limits of state funds appropriated therefor, in such manner as is psychiatrically indicated for his mental illness." 1982 Ga. Laws at 1476, 1485 (codified at Ga.Code Ann. § 17-7-131(g)). Spivey does not argue nor do we believe that this difference amounts to fundamental unfairness under these circumstances. Moreover, there is no evidence to suggest that Spivey's psychiatric needs have been denied in any respect.

[18]In light of the disposition of Claim XI, we need not address the state's arguments based on procedural default and *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (barring retroactive application of "new" rules).

of a document indicating the conviction. *See id.* at 585, 108 S.Ct. 1981. Thus, the death sentence relied on the mere fact of conviction. After the New York Court of Appeals reversed the conviction, the Mississippi Supreme Court denied Johnson post conviction relief even though the relied on conviction was now invalid. *See id.* at 582, 108 S.Ct. 1981. The United States Supreme Court reversed and held that allowing the death sentence to stand although based in part on a reversed conviction violates Eighth Amendment principles. *See id.* at 586, 108 S.Ct. 1981.

In contrast to *Johnson,* here there is extensive evidence of the conduct underlying the Bibb County conviction, much of it introduced by the defense as part of its trial strategy. Criminal conduct, even absent a conviction, is relevant and properly considered by the jury. *See Tucker v. Kemp,* 762 F.2d 1480, 1487 (11th Cir.1985) (en banc) ("In addition to previous convictions, it is acceptable to consider evidence of crimes for which a defendant has been indicted but not convicted. Activities for which there has been no charge filed can be considered as well. In general, the relevant inquiry is whether it is reliable.") (citations omitted), *vacated,* 474 U.S. 1001, 106 S.Ct. 517, 88 L.Ed.2d 452 (1985), *reinstated,* 802 F.2d 1293 (11th Cir.1986) (en banc) (per curiam). Thus, the question here is not what effect the introduction of evidence regarding the Bibb County crimes had on the trial, but rather what marginal impact the fact of conviction and life sentence had above and beyond the impact that the criminal conduct had on the outcome. *See Richardson v. Johnson,* 864 F.2d 1536, 1541 (11th Cir.1989) ("Even if the sentencing judge could not rely on these North Carolina convictions because they were unconstitutionally obtained, evidence of Richardson's past criminal 'activity' would have been admissible if the sentencing judge had found such information reliable."). We find that the marginal impact of the conviction and life sentence was slight in light of the extensive evidence and brutal nature of the actual underlying conduct.

The Supreme Court's decision in *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), guides us in determining whether or not this slight impact is harmless error. *See Duest v. Singletary,* 997 F.2d 1336, 1338 (11th Cir.1993) (adopting *Brecht* harmless error standard for *Johnson v.*

23

*Mississippi* claims on habeas review). In *Brecht,* the Court stated the proper harmless error standard for trial errors on habeas review:

> [W]hether the error had substantial and injurious effect or influence in determining the jury's verdict. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice.

407 U.S. at 637, 92 S.Ct. 2219 (quotation marks and citations omitted). Given the slight marginal impact, we conclude that although the trial court erred in using the vacated Bibb County conviction and sentence, the error was harmless because the effect was neither substantial nor injurious.[19] Accordingly, we affirm the district court with respect to Claim XI.

F.      *Claims XII & XVIII:  Brady v. Maryland Claims*

Spivey claims that the prosecutor unconstitutionally withheld three documents that contained favorable evidence to the defense:  1) Mary Jane Davidson's December 29, 1976 statement to the police, 2) the December 28, 1976 Supplemental Report of Columbus Police Department Detective R.G. Matthews, and 3) a letter of September 8, 1983 from the district attorney to Central State Hospital.[20] In *Brady v. Maryland,*

---

[19]*See also* note 15, *supra.*

[20]The state contends that Spivey's *Brady* claims are procedurally defaulted.  Spivey did not raise them in his first state habeas petition.  After Spivey acquired the documents in 1992 through the Georgia's Open Records Act, he raised the *Brady* claims with respect to these three documents for the first time in his second state habeas petition.  In 1995, the state court dismissed the second petition finding it successive under Ga.Code Ann. § 9-14-51, which mandates that all grounds for relief be raised by a petitioner in his original or amended petition and mandates that any grounds not so raised are waived "unless the Constitution of the United States or of this state otherwise requires or unless any judge to whom the petition is assigned, on considering a subsequent petition, finds grounds for relief asserted therein which could not reasonably have been raised in the original or amended petition."  The second state habeas court found no suppression of exculpatory evidence within the meaning of *Brady.  See Resp exh. vol 3 of 4, ex L.*

> In *Smith v. Zant,* 250 Ga. 645, 301 S.E.2d 32, 37 (1983), the Supreme Court of Georgia reversed a lower court's dismissal of his successive state habeas petition on § 9-14-51 grounds and held that where "the prosecution has the constitutional duty to reveal at trial that false testimony has been given by its witness, it cannot, by failing in this duty, shift the burden to discover the misrepresentation after trial to the defense."  Spivey argues that *Smith* indicates that where a prosecutor violates a constitutional duty to disclose, the defendant is not procedurally barred by § 9-14-51 because he could not reasonably have raised it earlier.  Thus, Spivey concludes, here Georgia

24

373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution." To establish a *Brady* violation, Spivey must prove: 1) that the government possessed evidence favorable to the defense, 2) that the defendant did not possess the evidence and could not obtain it with any reasonable diligence, 3) that the prosecution suppressed the evidence, and 4) that a reasonable probability exists that the outcome of the proceeding would have been different had the evidence been disclosed to the defense. *See Duest v. Singletary,* 967 F.2d 472, 478 (11th Cir.1992), *vacated and remanded,* 507 U.S. 1048, 113 S.Ct. 1940, 123 L.Ed.2d 647, *reinstated in relevant part,* 997 F.2d 1336 (11th Cir.1993).

In the first document, Davidson's statement, she reported a number of things that could be construed as favorable to the defendant. She said that he had a "Manic expression in his eyes (meaning the psycological [sic] term manic) in that he would not make direct visual contact, but a wavering expression with the eyes." She reported that "He explained that he had 75 rounds of ammunition and that he intended to use every one of them and at best, he only had a day to live. He intended to kill any cop that got near him, that they'd never take him alive" because he intended to shoot it out with the police and that "his wife had left him four months ago and would not let him see his daughter." She also said he gave her back some of the money he stole from her. Spivey argues that this evidence is favorable to him because his defense attempted to show he acted out of an irrational and self-destructive impulse and because it refutes the state's assertions that he was pitiless and without remorse.

---

procedural default law requires the consideration of the antecedent constitutional *Brady* question, *i.e.,* whether the prosecutor violated a constitutional duty to disclose, so federal review is not barred because the second habeas court decided this question erroneously. *See Ake v. Oklahoma,* 470 U.S. 68, 75, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) ("[W]hen resolution of the state procedural law question depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law, and our jurisdiction is not precluded."). Rather than attempt to resolve this state law question, we assume *arguendo* that there is no procedural bar, address the merits of Spivey's *Brady* claims, and, for the reasons stated in the text, find no *Brady* violation.

Spivey's claim with respect to this document fails, however, for two reasons: 1) he could have obtained it with reasonable diligence and 2) no reasonable probability exists that the outcome would have been different had the evidence been disclosed. First, a review of the 1977 trial transcript, which the 1983 trial counsel with reasonable diligence could have reviewed, reveals the existence of the statement and some of its contents. Before beginning the cross-examination of Davidson at the 1977 trial, defense counsel requested the previously written statement of the witness and the prosecution responded, "we've let the defense see the statement twice already, we don't mind letting them see it again, however, I don't think he's entitled to it until he starts to cross-examine the witness, we'll be glad to do that." 1977 Tr. Trans. 382-83. In fact, defense counsel did have the document in hand while cross-examining Davidson and even asked questions based upon the statement, for example, "Did you describe [his appearance] as a manic expression?"[21] Since Spivey should have known about the document and even some of its contents, he should have obtained the evidence by a specific request for this statement and, if that failed, a request to the court for an order to produce this specific statement.

Second, even had defense had this statement and been able to use it at trial, either directly or in its cross-examination of Davidson, there is no reasonable probability that the outcome would be different. Her comment about the manic expression provides little more understanding of Spivey's mental state in light of the violent outburst that followed. The comment about having only one more day to live and not being taken alive when considered in the context of his plan to shoot it out with the police also adds little to the defense's mental illness claim. At the 1983 trial, Davidson testified that "He told me that he had killed five people that day, and he put the gun back on me, touching me, and said, 'One more doesn't make any difference.' He told me that if the police came up that I would get it first and then he'd battle it out with the police." Tr. Trans.

[21]In addition, the State's Response to a Motion for Discovery dated June 7, 1977 indicates that the defendant "orally stated to Mary Jane Davidson, 'I am sorry about this,' at the time of his arrest" and " 'I am not proud of the charges made against me.' " This evidence was available to the defense and was a stronger indication of remorse Spivey showed Davidson.

26

at 1385. Given Spivey's extensive testimony about his marriage's collapse shortly before the offense and how he could not see his daughter, the fact that Davidson reported he told her about his wife leaving him and not being able to see his daughter would have had a minimal, if any, impact on the outcome. *See* Tr. Trans. 1707-12. The exclusion from jury consideration of the fact that Spivey gave her back some of the money he stole also has negligible impact and does not undermine confidence in the outcome.

The second document, the Matthews Report, contains statements of both Davidson and Spivey. In his report, Detective Matthews recorded that Davidson said that on several occasions Spivey talked of killing himself, that he tried to give her the gun but she refused out of fear, and that he offered to let her out of the car at one point, but she was afraid that he would shoot her if she did. The report also indicates:

> [Spivey] stated that he was very sorry for what had happened in the past 24 hours. He stated that he felt sorry for the dead policeman and his family, but that it was too late to feel sorry. He stated that it had been a nightmare since "it" happened. Spivey would make no further statements.

Resp. Ex. part 4 of 4. These statements, especially those of Spivey, favor the defense's mental illness strategy, though they suggest regret more than remorse.

Nonetheless, even if the defense had had this document, there is no reasonable probability of a different outcome.[22] The remark about feeling sorry for the policeman and his family add little to Spivey's claims of remorse.[23] The remark about Spivey's talk of suicide would have added only marginally to the considerable evidence of mental illness that the jury rejected in the guilt-innocence phase and sentencing phase of the trial.

---

[22]Spivey may also fail the reasonable diligence prong on this claim because some of the statements which apparently derive from the Matthews Report are found in the 1977 trial transcript though, unlike Davidson's statement, there is no explicit mention of the Matthews Report in the record.

[23]There was extensive testimony about Spivey's remorse since he committed the crime. Spivey himself, when asked if he felt sorry for what he had done, answered, "More than I could ever tell in a million lifetimes." Tr. Trans. 2375. Based on their experiences ministering to Spivey in prison, Rev. Stan McGraw, an Episcopal priest, and Rev. Bennett Sims, an Episcopal bishop, also testified about the great extent and sincerity of Spivey's remorse. *See* Tr. Trans. 2395, 2410-11.

The third document, the letter from the district attorney to Central State Hospital, lists the materials sent to the hospital for its upcoming examination of Spivey, including the Matthews Report and Davidson's statement. Assuming that the list contained in this document is exculpatory evidence, there is still no reasonable probability of a different outcome had Spivey had this document. Presumably if Spivey had this letter, he could have acquired the Matthews report and Davidson's statement. However, for the reasons stated above, Davidson's statement was otherwise readily available to him and there is no reasonable probability that these two documents would affect the outcome. Possession of the letter may have allowed, as Spivey asserts, a better cross-examination of Dr. Jacobs, the state's witness from Central State Hospital, but again the marginal improvement in the cross-examination does not produce a reasonable probability of a different outcome. Furthermore, defense counsel had the opportunity to cross-examine Dr. Jacobs about the material he used in evaluating Spivey.

Having reviewed the record, we find that there is no reasonable probability of a different outcome had these three documents been available to Spivey and, accordingly, affirm the district court with respect to Claims XII & XVIII.

## IV. CONCLUSION

For the reasons stated above, we find no federal or constitutional error warranting habeas corpus relief.[24] Accordingly, Spivey's appeal of the district court's denial of his petition for writ of habeas corpus is denied and the district court affirmed.

AFFIRMED.

BARKETT, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's judgment with the exception of its conclusion that the jury's reliance on Spivey's subsequently vacated Bibb County conviction and sentence in violation of *Johnson v. Mississippi* was a harmless error. I believe that the jury's consideration of Spivey's vacated conviction and life sentence, combined with the prosecutor's comments during closing arguments, fails to meet the Eight Amendment's "heightened 'need for reliability in the determination that death is the appropriate punishment.' " *Caldwell v. Mississippi,* 472 U.S. 320, 340, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (quoting *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion)). Thus, I believe Spivey is entitled to a new sentencing proceeding.

In *Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), the jury found three aggravating circumstances when sentencing Johnson for the murder of a Mississippi highway patrolman, one of which was that Johnson had "previously been convicted of a felony involving the use or threat of violence to the person of another." *Id.* at 581, 108 S.Ct. 1981. During sentencing, the prosecutor repeatedly

_____

[24]Spivey's remaining claims do not warrant habeas relief and do not warrant discussion. Accordingly, we affirm the district court with respect to Claims XIII (arguing his 1983 psychiatric evaluation was tainted by the unconstitutional 1977 evaluation), XIV (relating to the State's use of Spivey's admission to the arresting officer of his sexual activity with Davidson to impeach Spivey's testimony at trial that he had no recollection of the events during his crime spree), XV (arguing that the prosecutor's closing arguments at both phases of the trial contained comments about the quality of the victim's life and his family's assumed desire for revenge and injected improper considerations into the jury's decision-making process), XVI (arguing the prosecutor's closing arguments contained other comments, in particular improper references to the jury's responsibility, the prosecutor's expertise and opinions, and the defendant's attorney and experts, which unfairly prejudiced Spivey), XVII (arguing that the selective admission of portions of former testimony by Spivey's ex-wife was improper), XXII (arguing ineffective assistance of trial counsel), and XXIII (arguing ineffective assistance of appellate counsel).

referred to this prior conviction in urging the jury to sentence Johnson to death. The jury did so. Although Johnson's prior conviction was later vacated, the Mississippi Supreme Court nonetheless affirmed Johnson's death sentence despite the jury's consideration of the invalid conviction. Noting both the "special 'need for reliability in the determination that death is the appropriate punishment' in any capital case," *id.* at 584, 108 S.Ct. 1981 (quoting *Gardner v. Florida,* 430 U.S. 349, 363-64, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977)), and the "possibility that the jury's belief that petitioner had been convicted of a prior felony would be 'decisive' in the 'choice between a life sentence and a death sentence'," *id.* at 586, 108 S.Ct. 1981 (quoting *Gardner,* 430 U.S. at 359, 97 S.Ct. 1197), the United States Supreme Court vacated the death sentence and remanded for re-sentencing. The Court held that the sentence of death was inconsistent with the Eighth Amendment's prohibition against cruel and unusual punishment because "the jury was allowed to consider evidence that has been revealed to be materially inaccurate." *Id.* at 590, 108 S.Ct. 1981.

As the majority has noted, in order to grant habeas relief based on this trial error, we must find actual prejudice. Actual prejudice exists where the error "had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). In *Duest v. Singletary,* 997 F.2d 1336 (11th Cir.1993), this Court, in considering whether habeas relief was warranted where "the jury had based its recommendation of death upon consideration of a prior criminal conviction which was later vacated," *id.* at 1336, determined that the appropriate question was whether the jury's consideration of the defendant's vacated criminal conviction for armed assault with intent to murder "substantially influence[d] the verdict, or, at least, [if] a grave doubt exist[ed] as to whether it did." *Id.* at 1339 (internal quotation marks omitted).[1] We found that Duest was prejudiced by evidence of his earlier

---

[1]We had previously vacated Duest's sentence under the then-prevailing harmless error standard of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See Duest v. Singletary,* 967 F.2d 472 (11th Cir.1992). That judgment was vacated by the Supreme Court and remanded for reconsideration in light of *Brecht. See Singletary v. Duest,* 507 U.S. 1048, 113 S.Ct. 1940, 123 L.Ed.2d 647 (1993).

conviction because "Duest's sentencing jury was permitted to consider evidence that was materially inaccurate." *Id.*

I do not believe the majority fairly analyzes the question of whether prejudice occurred in this case. The majority assumes the answer first, by positing the question in terms of whether the "marginal" impact of the conviction is prejudicial and next, by asserting without analysis that the impact of this additional evidence was "slight". Evidence of a prior conviction may well have a slight impact in a given case. However, our responsibility is to examine the circumstance of this case to determine first, how the evidence of Spivey's prior conviction and sentence was presented to the jury, and second, in light of that presentation, what impact that information may have had on the jury's recommendation. In reversing the death sentence in *Johnson,* the Supreme Court found that

> [t]he prosecutor repeatedly urged the jury to give [the prior conviction] weight in connection with its assigned task of balancing the aggravating and mitigating circumstances. Even without that express argument, there would be a possibility that the jury's belief that petitioner had been convicted of a prior felony would be "decisive" in the "choice between a life sentence and a death sentence."

*Johnson,* 486 U.S. at 586, 108 S.Ct. 1981 (citations omitted). As in *Johnson* and *Duest,* there is no question in this case that the jury's attention was directly and emphatically drawn to the prior conviction and life sentence separate and apart from the underlying conduct. The prosecutor repeatedly urged the jury to sentence Spivey to death, arguing that precisely because of the previous conviction and life sentence, a life sentence would be a meaningless punishment in this case:

> State's Exhibit Number 22 among all the exhibits that you have to go out with you is an Indictment, a verdict of guilty, and a sentence to life imprisonment for the defendant in Bibb County, Georgia.... So your verdict of life imprisonment will not add one day of punishment to this man. Bear that in mind. Bear that in mind. And if that is not a slap on the wrist, and I don't want to be flip by using terms like a slap on the wrist but if that is not that then what is it? What is it? It is literally two lives, two human lives for the price of one because a person only has one life. If he is sentenced to life imprisonment on the first murder and you give him life on the second, is that appropriate punishment?

(Tr. Trans.2462-63). In his closing argument during the sentencing hearing the prosecutor again urged the jury to impose a death sentence because of Spivey's existing conviction and life sentence:

31

> Counsel will make a compelling argument for life imprisonment.... But is that appropriate punishment when you consider the Macon case where he has already got a life sentence? Why do we even go through the effort of trying this case when he has already got a life sentence on a crime that happened within two or three hours of this? Well, you will answer that for us.

(Tr. Trans.2467).

The majority recognizes that "[a]t the sentencing stage, the jury faced the central question of whether to sentence Spivey to death or to life imprisonment." Spivey was prejudiced here because the prosecutor presented the jury with a false choice between imposing death and imposing no punishment. Not only did the jury consider a conviction that has since been vacated, but the prosecutor presented the vacated life sentence not simply as *a* factor to consider but as *the* decisive factor in urging the jury to recommend a death sentence. One cannot ignore the government's argument to the jury and assume, as I believe the majority appears to, that because a prior killing occurred on the same night, no juror would have recommended a life sentence.[2] Our task is not to uphold a sentence merely because we might have imposed that sentence had we been jurors. Rather, our duty is to provide to the defendant that to which he is entitled—a jury of his peers who had true and accurate information on which to base their decision to impose a life or a death sentence. The circumstances in this case raise a sufficiently grave doubt in my mind that the jury's consideration of Spivey's vacated conviction and life sentence substantially influenced the sentence of death. *See Duest,* 997 F.2d at 1339. Therefore, I believe the death penalty imposed is constitutionally impermissible under *Johnson* and a new jury should be impaneled to consider the appropriate punishment based on accurate information.

---

[2]As in *Duest,* 997 F.2d at 1339, if even one juror who recommended the death sentence was substantially influenced by the existing life sentence, habeas relief is warranted because under Georgia law, if the sentencing jury does not unanimously recommend the death penalty, the trial court must impose a sentence of life imprisonment. *See Hill v. State,* 250 Ga. 821, 301 S.E.2d 269, 270 (1983); *Romine v. State,* 256 Ga. 521, 350 S.E.2d 446 (1986).

32